**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW MEYER, Individually and on behalf of all other similarly situated, | CASE No.: 1:16-cv-06467-RMB |
| Plaintiff, | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| CONCORDIA INTERNATIONAL CORP., MARK THOMPSON, and ADRIAN DE SLADANHA, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Lead Plaintiff, Tony Bernardo ("Bernardo") and named plaintiffs Bryan Boothby ("Boothby") and Elise Kern ("Kern" and together with Bernardo and Boothby, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon their personal knowledge. Plaintiffs base their information and belief upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of the regulatory filings of Defendant Concordia International Corp. ("Concordia" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC") and to Canadian Securities Administrators "SEDAR" website; (b) review and analysis of press releases, media reports, earnings conference calls and presentations that Defendants Concordia, Mark Thompson ("Thompson"), Adrian de Saldanha ("de Saldanha"), Edward Borkowski ("Borkowski") and Wayne Kreppner ("Kreppner" and with Thompson, de Saldanha and Borkowski "Individual Defendants" and with Concordia "Defendants") issued and that others issued concerning Concordia; and (c) review of other publicly available information concerning Concordia.

1

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of all persons and entities that acquired Concordia securities on U.S. Exchanges or in U.S. transactions between May 13, 2015, through August 12, 2016, inclusive (the "Class Period"), excluding Defendants and their affiliates, against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Concordia is an Oakville, Ontario specialty pharmaceutical company that owns a portfolio of branded and generic prescription products that it sells to wholesalers, hospitals and pharmacies in over 100 countries.

3.      On December 20, 2013, Defendant Thompson and his Concordia Private Co. executed a reverse merger of Concordia Private Co. ("Concordia Private") into Concordia Healthcare Corp.  Prior to that "qualifying transaction," through a subsidiary, Concordia Private began purchasing drugs with the purpose of marketing and selling them.  Before the qualifying transaction, in 2013, Concordia purchased three FDA approved drugs, Kapvay, Orapred ODT and Ulesfia, from Shionogi for total consideration of $28.7 million.  Again, before the qualifying transaction, in 2013, Concordia purchased Complete Medical Homecare, Inc. for total consideration of $13.2 million.  Before the qualifying transaction, Concordia Private, itself, purchased the drug Photofrin with the assets of Pinnacle for total consideration of $58 million.

4.      Once they completed the qualifying transaction, however, Thompson and Concordia accelerated the pace and size of their acquisitions.  On March 19, 2014, Concordia purchased Donnatal for $200 million in cash and 4.6 million Concordia shares.  On September 30, 2013, Concordia purchased Zonegran for total consideration of $91.4 million in cash.  On April 21, 2015, Concordia purchase the Covis Portfolio of drugs for $1.2 billion in cash.  Last, on

October 21, 2015, Concordia closed the acquisition of AMCo for $1.2 billion plus 8.49 million shares of Concordia.  In total, over three years, Concordia closed on asset purchases for cash consideration, alone, of nearly $2.8 billion in cash.  As the Company describes itself:

> As a result of the Qualifying Transaction and the completion of various acquisitions by the Corporation since 2013, . . . the Corporation has become an international specialty pharmaceutical company owning a broad portfolio of branded and generic prescription products which are sold to wholesalers, hospitals and pharmacies in over 100 countries. As at December 31, 2015, the Corporation employed 476 employees.

5.      Concordia funded these acquisitions with debt.  From a $195 million credit facility to purchase Donnatal to a private offering of $790 million in aggregate principal 9.5% senior notes, to the "AMCo Credit Agreement," whereby Concordia received secured term loans in two tranches of $1.1 billion and £500 million, in 2015, the Company's long term debt rose from $226.1 million at December 31, 2014 to $3.3 *billion* at December 31, 2015.  Prior to the Class Period, concerns arose among investors about Concordia's ability to meet its debt obligations.

6.      Donnatal is a drug, developed and first marketed in the 1940s, but still prescribed for conditions such as irritable bowel syndrome.  While the FDA has never approved Donnatal (because it predates the FDA's formation), in 2014, Concordia purchased from PBM Pharmaceuticals ("PBM") the right to market and to sell it, and sell Donnatal it does.  From the time of its purchase, Concordia was the sole seller Donnatal.  Before the Class Period, this exclusivity enabled first PBM and then Concordia to raise the price of Donnatal considerably to over $782 per prescription.

7.      By the end of 2015, Donnatal represented 33.9% of the Company's North America segment's revenue and at least 10% of its total revenue, Company-wide.  As such, Donnatal was critical to Concordia's cash flow and, in turn, its liquidity.  Unbeknownst to investors, however,

prior to the Class Period, third-party payors – insurers, pharmacy benefit managers, and managed care companies – began to exclude Donnatal from their prescription drug formularies.  Having warned investors generally of this risk, Defendants failed to disclose the materialization of this trend of which they were aware or recklessly disregarded.

8.      The third-party payors' exclusion of Donnatal from prescription drug formularies coincided with Defendant Thompson's pledge of his more than 2 million shares of Concordia common stock to secure personal loans.  Investors were unaware of Thompson's pledge.  At the same time, just prior to the Class Period, at least one private equity firm inquired about purchasing Concordia, causing the Concordia Board of Directors to form a special committee to evaluate strategic alternatives.  Defendants were, therefore, heavily motivated to maintain the price of Concordia stock and otherwise to project a positive picture of its cash flows – in particular from its most important, revenue-producing drug, Donnatal.

9.      In the face of a decline in Donnatal sales resulting from formulary exclusion, however, Defendants sought to project then current and future sales success, touting the efforts of its sales force to market and sell the drug and their 2016 commitment to those efforts.  This was a lie. At the beginning of the Class Period, on the very same day they touted Concordia's 175-person Donnatal sales force and the impact they expected it to have on Donnatal sales in 2016, later that day, Defendants fired Concordia's entire 75-80 person contract Donnatal sales force.  Thus, in response to probing questions from securities analysts about Concordia's continued commitment to its Donnatal sales efforts, Defendants told investors that they remained committed to their Donnatal sales efforts for the remainder of 2016 when they had actually materially curtailed Concordia's efforts.

10.     By mid-June, 2016, several major private equity firms had terminated talks to buy Concordia.  On August 12, 2016, Concordia issued a press release, announcing its financial results for the second quarter of 2016 and disappointing investors with a reduction in its 2016 guidance "primarily due to" among other factors, "competitive marketplace pressures with respect to two key products: Donnatal® and Plaquenil®."  During the Company's August 12, 2016 earnings conference call, continuing their lie about the Donnatal sales force, Defendants stated:

> Borkowski: Recent trends indicate that Donnatal is not being prescribed as frequently as we had anticipated, and we do not believe that, we will see the growth we expected from the additional sales efforts in the second-half of 2016. ***While our contract sales team has had success targeting traditional Donnatal prescribers, the sales team has had limited impact in growing the brand with doctors, who have not traditionally prescribed the drug***.
>
> *****
>
> Kreppner: Yes, I think, I guess, ***the big driver there was Donnatal***. We had obviously forecasted some significant growth in the second-half for Donnatal, ***based on our sales effort and our smart sales effort***. And given where we're seeing Donnatal now, that sort of flat going forward, we've taken that growth out of the revised forecast going forward. (Emphasis added).

11.     Thus, even in finally disclosing Donnatal's swoon, Defendants touted the efforts of a contract sales force that they had actually fired three months earlier.  In fact, Defendants had knowingly significantly curtailed Donnatal sales efforts by the beginning of the Class Period.

12.     On this news, Concordia' stock price fell $6.33 per share, or 38%, to close at $10.03 per share on August 12, 2016, on unusually heavy trading volume.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391, and Section 27 of the Exchange Act, 15 U.S.C. §78aa(c). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Concordia securities are actively traded in this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.      Lead Plaintiff, Tony Bernardo, as set forth in the certification he included with his Lead Plaintiff Motion, incorporated by reference herein, purchased Concordia securities during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Named Plaintiff Bryan Boothby purchased Concordia securities during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.[1]

20.     Named Plaintiff Elise Kern purchased Concordia securities during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.[2]

21.     Defendant Concordia International Corporation is an Ontario, Canadian corporation with its principal executive offices located at 277 Lakeshore Road East, Suite 302, Oakville, Ontario L6J, Canada. Until June 27, 2016, Concordia was known as Concordia Healthcare Corporation.  Concordia' common shares trade on the NASDAQ Stock market ("NASDAQ") under the symbol "CXRX."

22.     Defendant Mark Thompson ("Thompson") was, at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Concordia.  He was a founder of Concordia and served as its President from December, 2013, to June, 2015.

23.     Defendant Adrian de Saldanha ("Saldanha") was, at all relevant times, the Chief Financial Officer ("CFO") of Concordia.

24.     Defendant Edward J. Borkowski ("Borkowski") was, at all relevant times, an Executive Vice President and a Director of the Company.  Defendant Borkowski became EVP of Concordia in February, 2016.  Prior to that he had served as a Director of Concordia and as a member of Concordia's Audit Committee.  He resigned as a member of the Audit Committee upon

---

[1] Plaintiff Boothby's PSRLA Certification is attached hereto as Exhibit A and incorporated herein by reference.

[2] Plaintiff Kern's PSRLA Certification is attached hereto as Exhibit B and incorporated herein by reference.

becoming an EVP of the Company.

25.     Defendants Wayne Walter Kreppner ("Kreppner") was, at all relevant times, President and Chief Operating Officer ("COO") of Concordia.

26.     Defendants Thompson, Saldanha, Borkowski and Kreppner are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Concordia' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

27.     Both Defendants Thompson, and de Saldanha certified the Company's financial results and the description of its operations in the Company's Annual Report on Form 40-F for the year ended December 31, 2015 ("2015 40-F"),[3] stating:

> Pursuant to 18 U.S.C. section 1350, the undersigned officer of Concordia Healthcare Corp. (the "Company"), hereby certifies, to such officer's knowledge, that the Company's annual report on Form 40-F for the year ended December 31, 2015 (the "Report") fully complies with the requirements of section 13(a) or 15(d), as

---

[3] Concordia's Annual Report on Form 40-F for the year ended December 31, 2015 ("2015 Form 40-F"), with select exhibits, is appended hereto as Exhibit C.  The Certifications in question, exhibits to the 2015 40-F, are attached hereto as Exhibits C-1, C-2, C-3 and C-4.

applicable, of the Securities Exchange Act of 1934 and that the
information contained in the Report fairly presents, in all material
respects, the financial condition and results operations of the
Company.

## SUBSTANTIVE ALLEGATIONS

### Background

*The Company*

28.    Defendants described Concordia's business as follows:

Concordia Healthcare Corp. (the "Company", "Concordia" or the
"Group") is an international specialty pharmaceutical company,
owning, through its subsidiaries, a diversified portfolio of branded
and generic prescription products. Concordia reorganized its
business segments during the year and now has three reportable
operating segments, which consist of Concordia North America,
Concordia International and Orphan Drugs, as well as a Corporate
cost centre.

Concordia North America, formerly the Company's "Legacy
Pharmaceuticals Division", has product right sales of legacy
pharmaceutical products mainly in the United States. Concordia
North America operations are conducted through the Barbados
branch of Concordia Pharmaceuticals Inc. S.à r.l ("CPI"). CPI has a
portfolio of branded products and authorized generic contracts.

Concordia International operations are conducted through
Amdipharm Mercury Limited ("AMCo") and certain of its
subsidiaries. AMCo is an international specialty pharmaceutical
company, owning a diversified portfolio of branded and generic
prescription products, which are sold to wholesaler distributors,
hospitals and pharmacies in over 100 countries.

Both the Concordia North America and Concordia International
segments have products manufactured and sold through an out-
sourced production and distribution network and marketed
internationally through a combination of direct sales and local
partnerships. Manufacturing is mainly outsourced to contract
manufacturers.

Concordia's Orphan Drugs segment operations are conducted
through the Barbados branch of Concordia Laboratories Inc. S.à r.l
("CLI"). CLI owns Photofrin® for the treatment of certain forms of

rare cancer.

The Corporate cost centre consists of centralized costs incurred by the Company, as ultimate parent company of the Group.[4]

29.     Defendant Thompson formed Concordia through a late 2013 reverse merger with his Concordia Private Co.  Even before that qualifying transaction, Defendant Thompson had begun to purchase assets and entities to build what would become Concordia.  The pace and size of acquisition has grown since 2013.

**The Company's Acquisition Binge**
**And the Resultant Debt**

30.     Since late 2014, the Company completed four major acquisitions that swelled its size and gave it an instant international presence.

31.     First, it purchased from PBM Pharmaceuticals, Inc. ("PBM") the drug Donnatal. According to the Company:

> Donnatal®. Pursuant to the terms of an asset purchase agreement dated March 19, 2014, between CPI, Concordia and PBM Pharmaceuticals, Inc. (the "Donnatal Purchase Agreement"), on May 15, 2014, CPI completed the acquisition of Donnatal®, an adjunctive therapy in the treatment of irritable bowel syndrome and acute enterocolitis. CPI acquired Donnatal® for $200 million in cash and the issuance of an aggregate of 4,605,833 Common Shares, representing approximately 16.17% of the Corporation's outstanding Common Shares on a non-diluted basis (approximately 14.96% on a fully-diluted basis) after giving effect to the acquisition, as of the acquisition date. The Corporation paid for the cash component of the acquisition through a combination of available cash and debt financing.[5]

32.     Next, Concordia purchase Zonegran, stating:

> Zonegran ®. Pursuant to the terms of an asset purchase agreement dated September 3, 2014, by and between CPI and Eisai (the

---

[4] *See* Note 1 to Concordia's Consolidated Financial Statements for the fiscal year ended December 31, 2015, attached hereto as Exhibit C-6.

[5] See Exhibit C-5, at 7.

"Zonegran Purchase Agreement"), on September 30, 2014, CPI acquired Zonegran® from Eisai for $90 million in cash, plus approximately $1.4 million for purchased inventory. Zonegran is an antiepileptic drug originally created by Dainippon Pharmaceutical Co., Ltd., (currently Dainippon Sumitomo Pharma Co., Ltd.). Zonegran® was first approved by the FDA in March 2000 as an adjunctive therapy in the treatment of partial seizures in adults with epilepsy. In connection with the closing of the acquisition, the Corporation provided a guarantee in favour of Eisai in respect of the punctual payment, performance and discharge of CPI's payment and indemnification obligations under the Zonegran Purchase Agreement and the ancillary agreements entered into in connection therewith. The Corporation paid for the acquisition of Zonegran® through debt financing.[6]

33.     As 2015 arrived, Concordia purchased the "Covis Portfolio," stating:

Covis Portfolio. On April 21, 2015 (the "Covis Acquisition Closing Date"), pursuant to the terms of an asset purchase agreement dated March 9, 2015 (the "Covis APA"), by and among the Corporation, CPI, and Covis Pharma S.à.r.l, Covis Injectables S.à.r.l (together "Covis") and Covis Pharma Holdings S.à.r.l, the Corporation, through its subsidiary CPI, completed the acquisition of substantially all of the commercial assets of Covis for $1.2 billion in cash (the "Covis Acquisition"). The drug portfolio acquired from Covis (the "Covis Portfolio") consisted of branded products and authorized generic contracts, which address medical conditions in various therapeutic areas including cardiovascular, central nervous system, oncology and acute care markets. On October 5, 2015, the Corporation sold the injectable products acquired from Covis Injectables S.à.r.l, being Fortaz®, Zantac® and Zinacef®, for $10 million and $1 million for purchased inventory. The Corporation has integrated the remainder of the Covis Portfolio into the Corporation's Concordia North America operating segment.[7]

34.     Last, Defendants engaged in Concordia's largest single transaction, the purchase of

AMCo, giving it a robust international presence.  About the AMCo acquisition, the Company

stated:

---

[6] Exhibit C-5, at 8.

[7] Exhibit C-5 at 8.

AMCo. On October 21, 2015 (the "AMCo Acquisition Closing Date"), pursuant to the terms of a share purchase agreement dated September 4, 2015, as amended (the "AMCo SPA") the Corporation, through a wholly owned subsidiary, completed the acquisition (the "AMCo Acquisition") of 100% of the outstanding shares of AMCo from Cinven and certain other sellers (collectively, the "AMCo Vendors"). The AMCo Acquisition provided the Corporation with a diversified portfolio of 190 off-patent molecules, as well as entry into new therapeutic areas such as endocrinology, neurology, ophthalmology and urology. The Corporation, through its wholly-owned subsidiary, acquired AMCo for cash consideration of approximately £800 million ($1.24 billion as at the AMCo Acquisition Closing Date), 8.49 million Common Shares ($230.8 million as at the AMCo Acquisition Closing Date) and daily interest of £272,801 that accrued from June 30, 2015 to October 21, 2015 ($47.7 million as at the AMCo Acquisition Closing Date). In addition, the Corporation will pay to the AMCo Vendors a maximum cash earn-out of £144 million ($196.7 million as at the AMCo Acquisition Closing Date) based on AMCo's future gross profit over a period of twelve (12) months from October 1, 2015. As part of the purchase commitment the Corporation was required to repay on the AMCo Acquisition Closing Date AMCo's existing senior secured facilities in the respective principal amounts of £582 million and €440 million plus accrued interest and related cross-currency swaps ($1.4 billion as at the AMCo Acquisition Closing Date). The Corporation has included the AMCo group of companies into its Concordia International operating segment.

35.    As a result of these debt-fueled acquisitions, by the end of 2015, the Company's long term debt swelled from $226.145 million in 2014 to $3.3 billion in 2015, and increase of over 1400%.  As such, the Company's interest expense, payable in cash for 2015 was $91.228 million, up from a cash interest payment in 2014 of $5.288 million, an increase of over 1700%.[8]

***The Importance of Donnatal to Concordia's Cash Flows***

36.    According to the Company, "Donnatal® is used as adjunctive therapy for irritable bowel syndrome, a condition characterized by abdominal pain, bloating, and diarrhea or constipation. It may also be used as adjunctive therapy for acute enterocolitis and duodenal ulcer."

---

[8] *See*, Exhibit C-6, n. 12.

Further, in 2015, Donnatal represented 33.9% of Concordia North America's revenue.  According to the Company's Management Discussion & Analysis for the year ended December 31, 2015 ("2015 MD&A"), Concordia North America revenue "grew during 2015 primarily by the following factors:

> $127,413 revenue from the Covis Portfolio acquired on April 21, 2015; and
>
> A full year impact of revenue from Donnatal® and Zonegran® acquired in May and September 2014 respectively offset by declines in other legacy revenue. The Company began to expand its salesforce with respect to Donnatal® toward the end of 2015 and continuing into 2016 through an out-sourced sales contract provider.[9]

37.     In 2015, Concordia North America recorded $268.3 million in revenues, $90.954 million of which were Donnatal sales.  Concordia International recorded $115.7 million in revenue for 2015, representing revenues realized by AMCo since the AMCo acquisition closing date. North American Sales, therefore, represented 60% of all 2015 Concordia sales, of which Donnatal represented 33.9%.  Thus, Donnatal represented 20.34% of Concordia's total sales in 2015.[10]

38.     For over thirty years Donnatal faced competition from pharmaceutically equivalent generic products.  According to the factual findings of a district court judge in *Concordia Pharmaceuticals, Inc. v. Method Pharmaceuticals, LLC*, Civil Action No. 3:14CV00016, 2016

---

[9] Exhibit C-7, at 13.

[10] *See*, Exhibit C-5, at 20.  Even annualizing the contribution of the AMCo results to Concordia's consolidated results, Donnatal remains material to Concordia sales and its cash flow.  For the nine months ended September 30, 2016, Concordia North America contributed $208.913 million to total revenue of $637.741 million; Concordia's International segment contributed $428.828 million.  Concordia North America, therefore, represents 32.7% of Concordia's total revenue. Thus, at 33.9% of North American revenue, Donnatal continues to represent 11% of Concordia's total revenue. Tetroxin, the International segment's top-selling drug for 2015, representing 8% of that segment's total sales, accounts for 5.4% of total Concordia sales, less than half of Donnatal's contribution to total sales.

WL 1271082 (W.D. Va. March 29, 2016), beginning in August of 2011, generic manufacturers began to leave the market.[11]  Once the competition was gone, PBM Pharmaceuticals, owners of the rights to Donnatal, began increasing the price.

39.    By the time Concordia acquired Donnatal in 2014, there was no generic competition.  Within one month of acquiring Donnatal in May of 2014, Concordia raised the price of a prescription by 100%.  By May 23, 2016, Concordia had raised the price of Donnatal 122%, from $353 per prescription to $782 per prescription.[12]

40.    Defendants disclosed the risks relating to health insurers and other pharmacy benefit managers excluding Concordia products in their formularies.  For example, in the 2015 40-F, Ex.-99.5, Defendants warned:

> **The Corporation's ability to obtain third-party reimbursement for the cost of products and related treatment may not be adequate and the Corporation could lose the ability to obtain third-party reimbursement.**
>
> The Corporation's ability to successfully market the Corporation's products may depend in part on whether appropriate reimbursement levels for the cost of the products and related treatments are obtained from government authorities and private health insurers and other organizations, such as HMOs and MCOs. This reimbursement and the associated governmental healthcare reimbursement systems are under constant review. The Corporation also could lose the ability to access such reimbursement by government authorities and private health insurers and other organizations as a result of changing laws, policies and practices of such entities.
>
> Third-party payors increasingly challenge the pricing of pharmaceutical products. In addition, the trend toward managed health care in the United States, the growth of organizations such as HMOs and MCOs and legislative proposals to reform health care and government insurance programs could significantly influence

---

[11] Whether the competitors left the market voluntarily or were forced out was argued before the district court.  Concordia did not dispute that all generic competitors left the market.

[12] http://www.fiercepharma.com/pharma/concordia-shares-valeant-s-appetite-for-dramatic-price-hikes-report

the purchase of pharmaceutical products, resulting in price changes and/or a reduction in product demand. Such cost containment measures and health care reform could affect the Corporation's ability to sell its products, which could have a material adverse effect on the Corporation's business, financial condition and results of operations.

***Failure to be included in formularies developed by MCOs and other organizations may impact use of the Corporation's products***.

MCOs and other third party payors try to negotiate the pricing of medical services and products to control their costs. MCOs and pharmacy benefit managers typically develop formularies to reduce their cost for medications. Formularies can be based on the prices and therapeutic benefits of the available products. The breadth of the products covered by formularies varies considerably from one MCO to another, and many formularies include alternative and competitive products for treatment of particular medical conditions. Failure to be included in such formularies or to achieve favourable formulary status may negatively impact the use of the Corporation's products. If the Corporation's products are not included within an adequate number of formularies or adequate reimbursement levels are not provided, the Corporation's market share and gross margins could be adversely impacted, which could have a material adverse effect on the Corporation's business, financial condition and results of operations. (Emphasis in original).[13]

41.     By the beginning of the Class Period, however, on information and belief, Defendants knew or recklessly disregarded that major third-party payors had begun to remove Donnatal from their formularies, jeopardizing Concordia North America segment's best-selling drug – indeed, Concordia's best-selling drug.

42.     On August 2, 2016, Bloomberg First World published an article titled "CVS to Exclude Total of 131 Drugs from Coverage in 2017."[14]  In response to that article, Defendants

---

[13] According to the Glossary Defendants included in their 2015 40-F, Ex-99.5, an "MCO" is a managed care organization.  Exhibit C-5, at A-5.

[14] According to its 2016 formulary, CVS does not cover Donnatal.

issued an August 3, 2016 press release,[15] stating, in relevant part, that:

> To address recent reports, Concordia also confirmed today that there was one formulary change affecting two products in its North America portfolio.
>
> CVS Health confirmed this week that Nilandron®, Concordia's treatment for metastatic prostate cancer, and Dutoprol®, a treatment for high blood pressure, will be removed from CVS Health's formulary.
>
> Concordia believes this exclusion is immaterial to its business. According to IMS prescription data, CVS did not reimburse for Nilandron® at all in the past three years and has reimbursed Dutoprol® twice in 2016.

43.     Thus, Defendants were in contact with third parties that reimburse for the cost of the drugs Concordia sold in the U.S. and had access to, and accessed, independent means of verifying timely which third-party payors were paying for prescriptions of its drugs and how many prescriptions they were filling.

44.     In 2016, health insurers had begun to exclude Donnatal from their formularies. For example, the five largest private health insurers in the United States are UnitedHealth Group, Kaiser Foundation, Wellpoint, Inc. Group, Aetna Group and Humana Group.

45.     On its "UnitedHealthcare 4-tier Advantage Prescription Drug List," effective July 1, 2015, but available and "accurate as of May 19, 2015 and is subject to change after this date," UnitedHealthcare covered Donnatal prescriptions.   Sometime before July 1, 2016, however, UnitedHealthcare disseminated a document titled "Updates to your prescription benefits, Effective July 1, 2016."   In a section titled "Non-FDA approved medications excluded from coverage," UnitedHealthcare stated "[t]here are several prescription medications marketed that are not approved by the U.S. Food & Drug Administration (FDA). In order to ensure coverage is provided

---

[15] The August 3, 2016 Press release is attached hereto as Exhibit F and incorporated herein by reference.

for FDA-approved medications, UnitedHealthcare excludes medications that are not approved by the FDA." Among the medications the formulary expressly excluded was Donnatal.

46.     Similarly, for its "Premier Plus" plans, prior to January 1, 2016, Aetna classified Donnatal as a "non-preferred brand." As of January 1, 2016, however, Aetna changed Donnatal's designation to "NC," or not covered.

47.     More, Humana's all-inclusive 2016 Drug List, which became effective as of January 1, 2016, covered Donnatal with certain limitations, including the requirement that the prescribing physician "must get approval from Humana." It warned that "[y]our plan benefits won't cover this drug without prior authorization." Humana also imposed quantity limits on the prescription of Donnatal, classifying it as a "Level Four," for drugs with the highest cost. As of at latest November, 2016, however, Humana had removed Donnatal from its formulary.

48.     Other large insurers dropped Donnatal from their plans. Horizon Blue Cross/Blue Shield of New Jersey, for example, the nation's thirteenth largest insurer, announced that as of the second quarter of 2016, Donnatal would no longer be covered.

49.     Thus, in 2016, Defendants knew or were reckless in not knowing that many third-party payors had eliminated and were continuing to eliminate Donnatal from their formularies.

***Defendants Misrepresent
Concordia's Push to Market Donnatal***

50.     According to the Company 2015 40-F, Ex. 99.7, "The Company began to expand its salesforce with respect to Donnatal® toward the end of 2015 and continuing into 2016 through an out-sourced sales contract provider."[16] That contract provider was Ashfield Healthcare ("Ashfield") with which Concordia contracted to provide at least 75-80 pharmaceutical sales

---

[16] Exhibit C-7, at 13.

representatives to market Donnatal in the United States, comprising at least 43% of the total Donnatal 175-person sales force Defendants publically claimed.

51.     Among Ashfield's capabilities is outsourcing a healthcare entity's sales function. According to Ashfield's website, "From sales representatives to call centre solutions to brand management, we offer comprehensive and flexible sales and marketing solutions with the right blend of channels to support your brand."  Ashfield continues, offering pharmaceutical companies:

> Whether you're a billion-dollar blue-chip pharmaceutical company or a start-up, our tailored services will drive your success. Our high-quality **contract sales teams** will help push your biopharmaceutical brands past their targets.   We'll work with you to create exceptionally capable teams of **pharmaceutical sales representatives** that change customer behavior through meaningful interactions. As one of the largest international **contract service organizations** in the US, we have an exceptional track record. Our dynamic thinking and innovative solutions have helped clients in 20 countries to adapt and get the advantage in today's fast-moving healthcare environment. We believe that genuine partnership working is the only way to get results, enabling us to keep delivering improvements for you both now and in the future." (Emphasis in original).

52.     Sometime in January, 2016, Concordia hired Ashfield to create a sales staff in the U.S., mostly to sell Donnatal.  Concordia executives were intimately involved in the hiring of Ashfield's Donnatal Salespeople.  According to FE1,[17] in January 2016, before Ashfield hired him, it flew him to San Antonio, Texas to meet with Aaron Hullett, Concordia's Director of Sales. Hullett approved FE1's hiring, telling him he was "young and passionate," and "would do well."

53.     According to FE1, on Friday, May 13, 2016, without warning, Ashfield convened an "emergency conference call" and fired all 75-80 of its Donnatal salespeople, effective immediately.  Blake Kelley, Ashfield's Vice President of Sales, led the call.  Concordia hired him

---

[17] FE1 worked for Ashfield to market Donnatal from January to May of 2016.  FE1 reported to Ashfield's VP of Sales, Blake Kelly.  Kelley is now the Director of Sales for Defendant Concordia.

within one month of that May 13 call as its Director of Sales.  Three Concordia representatives were on the call.  No reason for the termination was provided.  Following the call, all of the Donnatal salespeople immediately received emails with termination paperwork, and were instructed to return their company cars.

54.     Other Donnatal salespeople who were fired during the conference call confirm FE1's account of the brief call to fire the entire Ashfield Donnatal staff.  FE2, an Ashfield pharmaceutical representative from January, 2016, to May, 2016, who sold Donnatal in the Sacramento, California area, stated that Ashfield and Concordia fired 80 salespeople without explanation, then immediately transmitted emails with required paperwork and instructions for returning their company cars.  FE3, another Ashfield pharmaceutical sales representative who sold Donnatal from January, 2016, to May, 2016, stated that the firings during the May 13, 2016 Ashfield conference call came "out of the blue."  FE4 sold Donnatal as an Ashfield contract worker from January, 2016, to May, 2016.[18]  According to FE4, each of the Ashfield contract salespersons was assigned separate sales territories.  Again, according to FE4 the contract was supposed to be 18-24 months in length.  FE4 confirmed that a Concordia representative who supervised Ashfield's Donnatal salespeople participated in the May 13, 2016 call.  According to FE4 Ashfield also fired all of the Ashfield District Managers during the call, and that 78 Donnatal salespeople were fired in total.

55.     The same day that Ashfield and Concordia fired 75-80 Donnatal salespersons, May 13, 2016, Concordia's executives held an earnings conference call ("May 13 Conference Call").  During that call, Concordia not only failed to state that it was firing, immediately, a large percentage of its Donnatal sales force, but specifically touted the progress of that same sales force.

---

[18] FE4 reported to a District Manager who reported to Blake Kelley, Ashfield's VP of Sales.

56.     During the call, in which all of Concordia's senior executives participated, Defendant Edward Borkowski, a Concordia Director and Executive Vice President, addressed the issue of the Company's Donnatal sales force.   Presenting a positive, but false, assessment, Borkowski stated that "[o]ur 175 person sales team continued to make progress with Donnatal.... Our sales team is executing our initiatives and we expect the impact will ramp up during the next two quarters."  Omitting mention of the firing of between 43-46% of the sales force he claimed was "executing our initiatives" – a sales force Defendants had caused to be fired that very day – Defendant Borkowski continued, stating "[a]nd we expect as it has in the past Donnatal will respond to our promotional efforts in the coming months."

57.     During the question and answer period of the May 13 Conference Call, Defendant Borkowski doubled down on the positive sales outlook, not only failing to mention the firings that occurred that same day, but affirmatively stating that the sales force was doing good work whose fruits would be realized during the rest of 2016.  Responding to a question from Scotiabank analyst Alan Ridgeway ("Ridgeway"), requesting elaboration on what the Company was "seeing and hearing in [the] market… just on Donnatal," Defendant Borkowski stated that "I think from our sales force… the renewed processes is kind of new still, but I think it's encouraging…."  He continued "I think reminding the docs that Donnatal is an adjunct therapy is taking effect slowly and we would expect that to build through the year, as we said before we expect it to take probably at least another two quarters before we really see the full impact of those efforts."

58.     Analyst Ridgeway followed up, asking "so you guys are committed for at least another quarter or two until you get a good look at how this is impacting [Donnatal] sales, is that fair to think about?" Defendant Borkowski tripled down on his false statement and omission,

stating that "[y]es, there is no reason at this point to do anything different, and we do believe it is going to respond."

59.     On August 12, 2016, Concordia released a 6-K discussing its Q2 2016 results, signed by Defendant Thompson.  The Company filed its "Management's Discussion and Analysis" ("MD&A") as Exhibit 99.2 to the 6-K.  In the MD&A, Concordia announced that Donnatal sales declined 31% in Q2 2016 compared to Q2 of 2015.  The Company blamed this decline on "lower product demand as a result of competitive pressures."  The filing makes no mention of the firing of the contracted Ashfield Donnatal sales force on May 13, 2016.

60.     During an earnings conference call held that same day, August 12, 2016 ("August 12 Conference Call"), Defendants cited declining Donnatal sales as a main reason for taking a $567 million impairment, cancelling a planned dividend of $0.75, and lowering Concordia's 2016 revenue forecast.  Defendant Borkowski cited "competition within the therapeutic class" for "adjunctive treatment for irritable bowel syndrome"[19] as the reason for declining Donnatal sales. Once again, Defendants omitted that they caused Ashfield to fire 75-80 Donnatal salespersons on May 13, 2016.

61.     In fact, there was no increased "competition within the "therapeutic class," and certainly not for "adjunctive treatment for irritable bowel syndrome."   Donnatal is in the therapeutic class "Belladonna Alkaloids" and/or "Antispasmodics and GI Motility." According to the National Institutes of Health's website, "DailyMed," which lists all drugs marketed in the United States, as well as the date on which marketing began, no Donnatal equivalents were introduced to the market in either 2015 or 2016.  Other treatments for irritable bowel syndrome,

---

[19] Adjunctive treatment is "an additional substance, treatment or procedure used for increasing the efficacy or safety of the primary substance, treatment, or procedure or for facilitating its performance.  *See* http://medical-dictionary.thefreedictionary.com/adjunctive.

such as Xifaxan, are neither "Belladonna Alkaloids" nor "Antispasmodics and GI Motility," instead falling into the therapeutic class of "Anti-infectives." Nor are they adjunctive treatments

62.     Defendant de Saldanha confirmed that Defendant Borkowski was not referencing any newer drugs in different therapeutic classes when discussing competition that had hurt Donnatal sales.  In colloquy with TD Securities analyst Lennox Gibbs ("Gibbs"), de Saldanha was clear that competition from new products was not eroding Donnatal's market share:

> Gibbs: Okay. And this is flat in terms of market share and you're fairly confident that it – that did not likely to see erosion from the newer product in terms of market share?
>
> de Saldanha: Yes. New – we see new products are growing the market rather than eroding Donnatal's share.

63.     Defendant Borkowski continued, stating that "[r]ecent trends indicate that Donnatal is not being prescribed as frequently," then stated the company's belief that sales would not grow in the second half of 2016.  In fact, Defendant Borkowski again led investors and analysts to believe that the Donnatal sales force remained unchanged, stating that "we are looking at options for our contract sales teams" and that "[w]e still believe in the value of promotional support for Donnatal," never acknowledging that the entire contract sales team had been fired three months earlier.

64.     Responding to a question from Scotiabank's Ridgeway, Defendant Borkowski stated that half of the decline in revenue – $50 million – was due to the anemic Donnatal sales. Defendant Kreppner continued the charade of a robust Donnatal sales force, stating that the Company "had obviously forecasted some significant growth in the second half for Donnatal, based on our sales effort. . ." when Defendants knew or recklessly disregarded that on the day the Class Period began, Concordia caused Ashfield to fire 75-80 Donnatal salespeople.

65.     The quarter-over-quarter selling and marketing expense of Concordia's North America segment supports that Concordia fired its contract sales team.  On August 12, 2016, Defendants disclosed that Concordia North America's "selling and marketing" expense fell from $4.973 million in the quarter ended March 31, 2016 to $3.342 million in the quarter ended June 30, 2016, a 32% decline from quarter-over-quarter.

66.     Thus, by the beginning of the Class Period, Defendants knew or recklessly disregarded that they had seriously and materially curtailed their Donnatal sales efforts.  Even as Defendants had decided to, and had, scaled back Concordia's financial and personnel commitment to grow or maintain Donnatal sales, to market the drug, they reassured investors that their commitment not only remained unchanged, but specifically that their commitment to the Company's Donnatal sales force would remain unchanged for the remainder of 2016.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

67.     The Class Period begins on May 13, 2016. On that date, Concordia filed with the SEC its Form 6-K for the quarter ended March 31, 2016 ("March 31 6-K").[20]  Among other Exhibits, the March 31 6-K attached as Exhibit 99.1 a May 13, 2016 press release titled, "Concordia Healthcare Announces First Quarter 2016 Results and Acquisition of Four Products with Global Rights."[21]  The March 31 6-K also appended as Exhibit 99.3 Concordia's Unaudited Condensed Interim Consolidated Financial Statements for the quarter ended March 31, 2016 ("March 31 Financial Statements")[22] and, as 99.2, Defendants' "Management's Discussion and

---

[20] Defendants' Form 6-K, with exhibits, for the quarter ended March 31, 2016, filed with the SEC on May 13, 2016 is appended hereto as Exhibit D and incorporated herein by reference.

[21] Exhibit D-1.

[22] Exhibit D-3.

Analysis" section ("March 31 MD&A").[23]

68.     In the March 31 MD&A, Defendants instructed investors to review the March 31

6-K in conjunction with its MD&A for the year ended December 31, 2015 ("December 31

MD&A"), stating that the March 31 MD&A "should be read in conjunction with the unaudited

condensed interim consolidated financial statements and the notes thereto as at and for the three

months ended March 31, 2016 and the financial statements and MD&A for the year ended

December 31, 2015."[24]

69.     In addition, they incorporated in the March 31 MD&A the "Risk Factors" from

the Company's 2015 40-F, stating, "[t]he results of operations, business prospects and financial

condition of Concordia will be affected by, among other things, the "Risk Factors" they included

in Concordia's Annual Information Form dated March 23, 2016 available" on the CSA's SEDAR

website and on the SEC's EDGAR website.[25]

70.     The foregoing March 31 6-K was false and misleading because Defendants

omitted any reference whatsoever to their determination to severely curtail their Donnatal sales

force.

71.     Defendants incorporated by reference into the March 31 6-K their risk disclosures

relating to sales to critical drugs like Donnatal.  They cautioned about the failure to be included in

formularies as follows:

> ***The Corporation's ability to obtain third-party reimbursement for
> the cost of products and related treatment may not be adequate and
> the Corporation could lose the ability to obtain third-party
> reimbursement.***

---

[23] *See* Exhibit D-2.

[24] Exhibit D-2, at 2.

[25] *Id.*

The Corporation's ability to successfully market the Corporation's products may depend in part on whether appropriate reimbursement levels for the cost of the products and related treatments are obtained from government authorities and private health insurers and other organizations, such as HMOs and MCOs. This reimbursement and the associated governmental healthcare reimbursement systems are under constant review. The Corporation also could lose the ability to access such reimbursement by government authorities and private health insurers and other organizations as a result of changing laws, policies and practices of such entities.

Third-party payors increasingly challenge the pricing of pharmaceutical products. In addition, the trend toward managed health care in the United States, the growth of organizations such as HMOs and MCOs and legislative proposals to reform health care and government insurance programs could significantly influence the purchase of pharmaceutical products, resulting in price changes and/or a reduction in product demand. Such cost containment measures and health care reform could affect the Corporation's ability to sell its products, which could have a material adverse effect on the Corporation's business, financial condition and results of operations.

### *Failure to be included in formularies developed by MCOs and other organizations may impact use of the Corporation's products.*

MCOs and other third-party payors try to negotiate the pricing of medical services and products to control their costs. MCOs and pharmacy benefit managers typically develop formularies to reduce their cost for medications. Formularies can be based on the prices and therapeutic benefits of the available products. The breadth of the products covered by formularies varies considerably from one MCO to another, and many formularies include alternative and competitive products for treatment of particular medical conditions. Failure to be included in such formularies or to achieve favourable formulary status may negatively impact the use of the Corporation's products. If the Corporation's products are not included within an adequate number of formularies or adequate reimbursement levels are not provided, the Corporation's market share and gross margins could be adversely impacted, which could have a material adverse effect on the Corporation's business, financial condition and results of operations.  (Emphasis in original).[26]

---

[26] Exhibit C-5, at 58.

72.     The foregoing risk disclosures were false and misleading because Defendants knew or were reckless in not knowing that the events about which they warned had already come to pass.  In subsequent public disclosures about the removal of several of its drugs from a CVS formulary, Defendants made clear that they were in contact with third-party payors and had access to, and accessed, independent means of verifying timely which third-party payors were paying for prescriptions of its drugs and how many prescriptions they were filling.  Thus, Defendants knew or, or were reckless in not knowing that a material number of large, third-party payors first contemplated and then actually excluded Donnatal from their formularies.

73.     Indeed, Defendants knowingly or recklessly omitted that:

a.     Sometime before July 1, 2016, however, UnitedHealthcare disseminated a document titled "Updates to your prescription benefits, Effective July 1, 2016."  In a section titled "Non-FDA approved medications excluded from coverage," UnitedHealthcare stated "[t]here are several prescription medications marketed that are not approved by the U.S. Food & Drug Administration (FDA). In order to ensure coverage is provided for FDA-approved medications, UnitedHealthcare excludes medications that are not approved by the FDA."  Among the medications expressly excluded was Donnatal, which UnitedHealthcare had previously included in its formulary.

b.     For its "Premier Plus" plans, Aetna, effective January 1, 2016, changed Donnatal's designation to "NC," or not covered, where prior to January 1, 2016, Aetna classified Donnatal as a "non-preferred," but covered, brand.

c.     While Humana's all-inclusive 2016 Drug List, effective as of January 1, 2016, covered Donnatal with certain limitations, including the requirement that the prescribing physician "must get approval from Humana," sometime before November, 2016, Humana

communicated that Donnatal would be removed from its formulary.

         d.    Other large insurers dropped Donnatal from their formularies.  Horizon Blue Cross/Blue Shield of New Jersey, for example, the nation's thirteenth largest insurer, announced that as of the second quarter of 2016, Donnatal would no longer be covered.

       74.    On May 13, 2016 at 8:30 a.m. EDT, before the opening of the market, Defendants convened a conference call with investors ("May 13 Conference Call").  Among others, Defendants Borkowski, de Saldanha, Thompson and Kreppner participated in the conference call along with analysts Alan Ridgeway of Scotiabank ("Ridgeway"), David Common of JPMorgan Chase & Co ("Common"), Douglas Miehm of RBC Capital Markets ("Miehm"), Lennox Gibbs of TD Securities ("Gibbs"),  Prakash Gowd of CIBC ("Gowd"), Miles Highsmith of RBC Capital Markets ("Highsmith"), David Martin of Bloom Burton & Co. ("Martin"), Cynthia Guan of Goldman Sachs & Co. ("Guan"), Brandon Osten of Venator ("Osten"), and Munish Malhotra of Marsico Capital ("Malhotra").[27]

       75.    During Defendant Borkowski stated:

> Thanks, Adrian, good morning everyone. We are very excited about our first quarter consolidated and segment results because they continue to demonstrate the strength and diversity of our business and the outstanding execution of our employees. My remarks today will be focused on two key segments, Concordia North America and our International segment and what drives these businesses forward.
>
> Our North America segment performed in line with our expectations in the first quarter and improved over the fourth quarter as we indicated in our year end conference call. Our Q1 performance benefited from contributions from Plaquenil and Lanoxin. Plaquenil authorized generic performance improved over the fourth quarter of 2015 including the impact of the resolution of supply issues that we experienced in the third and fourth quarters.

---

[27] Appended hereto as Exhibit E and incorporated herein by reference is a transcript of the May 13 Conference Call.

> Our 175 person sales team continued to make progress with Donnatal and Nilandron in our first quarter. Our sales team is executing our initiatives and we expect the impact will ramp up during the next two quarters. Nilandron is showing encouraging signs of growth and during the first quarter we noted an improvement in new scripts for Nilandron since retailing began in February.
>
> And we expect as it has in the past Donnatal will respond to our promotional efforts in the coming months. Furthermore, the first quarter 2016 sales of Donnatal were up over the same period in 2015 predominantly due to an increase in volume. Looking ahead we anticipate low single digit growth from our North America segment based on approximately equal parts pricing and volume growth.[28]

76.     The foregoing was false and misleading because Defendants knew or were reckless in not knowing that:

      a.     They had caused their entire 75-80 person Donnatal contract sales force to be fired on that same date, evidencing their lack of commitment to the promotion of Donnatal;

      b.     They had caused their entire 75-80 person Donnatal contract sales force to be fired on that same date, and Concordia no longer had a 175 person Donnatal sales team;

      c.     Due to the firing of the Ashfield contract sales force, the sales team's "initiatives" would decrease in the "the next two quarters," and could not and could not "ramp up;"

      d.     Defendants were in contact with third parties that reimburse for the cost of the drugs Concordia sold in the U.S. and had access to, and accessed, independent means of verifying timely which third-party payors were paying for prescriptions of its drugs and how many prescriptions they were filling.  Many of the nation's biggest health care insurers, including three of the five largest, had already dropped Donnatal from their formularies in 2016, or had already decided to drop Donnatal from their formularies during 2016.  Defendants knew or recklessly failed to disclose the changes in insurers' formularies dropping coverage of Donnatal, as well as

---

[28] Exhibit E, at 3-4.

the impending changes in insurers' formularies dropping coverage of Donnatal.

77.     During the same May 13 Conference Call, colloquy between Defendant Kreppner and analyst Gowd included the following :

> Gowd: No problem. Thanks. Just on Donnatal quickly, can you talk a little bit about ***the marketing strategy and the detailing strategy that the reps are going out there with in terms of what types of doctors are being targeted***, what is the patient profile that they are promoting Donnatal for and any changes on the reimbursement front on Donnatal, are they positive or negative?

> Kreppner: Yes, it's Wayne here. With regards to the messaging for Donnatal, it's really a reminder detail. The doctors we're targeting are doctors that were high prescribers of Donnatal historically. And the patient population are patients who would have used, known and love Donnatal and used it consistently prior to any of the generics that were on the market pre-2011.  So our detailing is really about Donnatal being available and affordable for physicians who know and love Donnatal and understand its use and place therapy.

> Gowd: Any changes on the reimbursement front?

> Kreppner: No, nothing that we've seen, there has been changes over time on Donnatal due to its regulatory status, but nothing other than that.  (Emphasis added).[29]

78.     The foregoing statements of Kreppner were false and misleading because Defendants knew or were reckless in not knowing that:

a.     They had caused their entire 75-80 person Donnatal contract sales force to be fired on that same date, evidencing their lack of commitment to the promotion of Donnatal;

b.     Because they had caused their entire 75-80 person Donnatal contract sales force to be fired on that same date, Concordia no longer had a 175 person Donnatal sales team "targeting" doctors or "remind[ing]" doctors about Donnatal;

---

[29] Exhibit E, at 9.

c.      Donnatal was not "affordable," as Concordia had raised the price of a prescription by 122%, from $353 per prescription to $782 per prescription; and

d.      Donnatal was not "available" to doctors as it had been in the past, and there had been material changes "on the reimbursement front."  Defendants were in contact with third parties that reimburse for the cost of the drugs Concordia sold in the U.S. and had access to, and accessed, independent means of verifying timely which third-party payors were paying for prescriptions of its drugs and how many prescriptions they were filling.  Many of the nation's biggest health care insurers, including three of the five largest, had already dropped Donnatal from their formularies in 2016, or had already decided to drop Donnatal from their formularies during 2016.  Defendants knew or recklessly failed to disclose the changes in insurers' formularies dropping coverage of Donnatal, as well as the impending changes in insurers' formularies dropping coverage of Donnatal.

79.     Again during the May 13 Conference Call, analyst Ridgeway engaged Defendant Borkowski as follows:

> Ridgeway: Okay, okay, great, thanks that's helpful. And then secondly, just on Donnatal, can you guys just comment a little bit on what you're seeing and hearing in that market? The weekly prescriptions based on what we're looking at, it looks like they have stabilized somewhat and we know there is seasonality in this business in the first quarter, there has been over the last few years. So I just wanted to get a little bit of expanded thoughts maybe on where and how the promotion is going and maybe what kind of feedback the sales guys are hearing from the competitive pressure possibly from new products et cetera?

> Borkowski: Hey, Al, this is Ed, I'll take a shot at a couple of things here on Donnatal. I think first off, what we've seen at least in the last two years going from the fourth quarter to the first quarter there tends to be drop off coming out of the fourth quarter as Donnatal is used a lot around the holiday season, maybe a little higher than the rest of the year. So the first quarter what we've seen traditionally has been a decline from the fourth to the first and I would say this the

first quarter 2016 was no different. However, I would say it was up low double single digits over the prior year.

*****

*And I think from our sales force, I mean I think that process is, the renewed processes is kind of new still, but I think it's encouraging and even though there's been some new entrants in the space, I think reminding the docs that Donnatal is an adjunct to therapy is taking effect slowly and we would expect that to build through the year, as we said before we expect it to take probably at least another two quarters before we really see the full impact of those efforts*.

Ridgeway: Okay, so *you guys are committed to the promotion for at least another quarter or two* until you get a good look at how this is impacting sales, is that fair to think about?

Borkowski: *Yes, there is no reason at this point to do anything different and we do believe it is going to respond*. Everything takes time. I know people don't like that, but it does take time. And if you go back to the thesis of legacy products, let's just think about that for a second it was to buy things well and have them produce solid cash flow within the metrics that we have.

So if you look at this product it is going to pay itself off in three years. It is going to continue to generate high margin, high profit for us for many, many years to come and the IRR for us in our current model is north of 25%. So that's quite honestly a deal I would do every day though.  (Emphasis added).[30]

80.     The foregoing statements were false and misleading because defendants knew or were reckless in not knowing that:

a.     They had caused their entire 75-80 person Donnatal contract sales force to be fired, evidencing their lack of commitment to the promotion of Donnatal, much less for "at least another quarter or two;"

b.     By causing their entire 75-80 person Donnatal contract sales force to be fired, Defendants had done something "different" with respect to the promotion of Donnatal,

---

[30] Exhibit E, at 5-6.

contrary to Defendant Borkowski's statement;

      c.     They had caused their entire 75-80 person Donnatal contract sales force to be fired, and Donnatal prescriptions were materially lower in Q2 2016, so the results were not "encouraging;"

      d.     Donnatal was not available to doctors as it had been in the past.  Defendants were in contact with third parties that reimburse for the cost of the drugs Concordia sold in the U.S. and had access to, and accessed, independent means of verifying timely which third-party payors were paying for prescriptions of its drugs and how many prescriptions they were filling. Many of the nation's biggest health care insurers, including three of the five largest, had already dropped Donnatal from their formularies in 2016, or had already decided to drop Donnatal from their formularies during 2016.  Defendants knew or recklessly failed to disclose the changes in insurers' formularies dropping coverage of Donnatal, as well as the impending changes in insurers' formularies dropping coverage of Donnatal.

81.     During the May 13 Conference Call, analyst Common engaged Defendants Thompson an de Saldanha about pricing in North America products as follows:

> Common: Okay, and then from a second question, just if I could ask you, what sort of puts and takes headwinds, tailwinds are known to you at this time in the North American business in particular as we consider progression through the rest of the year, seasonality, Plaquenil volumes, anything volume and price that we should be thinking about to avoid surprises? Thanks.
>
> Thompson: You know, David, I think as we see the year playing out I think it starts off where we are currently and build throughout the year. I think probably the two things that *we're focused on is with the sales force efforts around Donnatal* and Nilandron and as we said, we think that will come into play more, *you will see it more as the year builds*. But from that – from a headwind or tailwind perspective, *I think that's our focus is the execution*, the rest of our business is performing as we expected and projected.

Common: And prices as a part of that, are you seeing prices play out pretty much exactly as you expected?

Thompson: I think so far it seems to be right on track, yes.

de Saldanha: And *we haven't experienced any pricing pressure. It is business as usual*.  (Emphasis added).[31]

82.     The foregoing statements were false and misleading because defendants knew or were reckless in not knowing, but failed to disclose that:

a.     They had caused their entire 75-80 person Donnatal contract sales force to be fired, evidencing their lack of commitment to the promotion of Donnatal, and that they were not "focused on sales force efforts around Donnatal;"

b.     Because they caused their entire 75-80 person Donnatal contract sales force to be fired, they had reduced, rather than "focused," their "sales force efforts around Donnatal," both at that moment and "as the year built;"

c.     Because they caused their entire 75-80 person Donnatal contract sales force to be fired, materially hampering their promotions and sales efforts, they were not "focus[ed] on "the execution" of their Donnatal sales force efforts;"

d.     They had caused their entire 75-80 person Donnatal contract sales force to be fired, and Donnatal prescriptions were materially lower in Q2 2016;

e.     Concordia had created "pricing pressures" by raising the price of a Donnatal prescription by 122%, from $353 per prescription to $782 per prescription; and

f.     Donnatal was not available to doctors as it had been in the past, at least in part because of "pricing pressures."  Defendants were in contact with third parties that reimburse for the cost of the drugs Concordia sold in the U.S. and had access to, and accessed, independent

---

[31] Exhibit E, at 6-7.

means of verifying timely which third-party payors were paying for prescriptions of its drugs and how many prescriptions they were filling.  Many of the nation's biggest health care insurers, including three of the five largest, had already dropped Donnatal from their formularies in 2016, or had already decided to drop Donnatal from their formularies during 2016.  Defendants knew or recklessly failed to disclose the changes in insurers' formularies dropping coverage of Donnatal, as well as the impending changes in insurers' formularies dropping coverage of Donnatal.

83.     Still further, on the May 13 Conference Call, analyst Walewicz engaged Defendant Thompson about the potential of leveraging the sales force for prompting other products as follows:

> Walewicz: Yes, good morning. Congratulations on the quarter. I think most of my questions have been answered, but I just wanted to ask maybe a little bit strategically thinking about the U.S. business. With some, it looks like Donnatal in Q1 had a good quarter and is responding hopefully over the next two months on the promotional front. Just wondering if you're thinking about potentially building that out or adding to that, specifically I'm just saying in licensing or some adjacent products potentially there's some things in the AMCo that you can you can sort of add to the bag and sort of better leverage the sales team and you build out maybe more of a commercial presence in the U.S. Thanks, I'll leave it there.
>
> Thompson: Yes the *opportunity to add products to the bag for rep is always there*. I mean one of the things we've done obviously is to leverage that field force for Nilandron and we're seeing very good results from that already. *But as we assess the field force we're always looking for new opportunities and new products to put in their bag*.  (Emphasis added).[32]

84.     The foregoing was false and misleading because Defendants knew or were reckless in not knowing that they had fired their entire 75-80 person Donnatal contract sales force, and those sales personnel not only were no longer selling Donnatal, but there was no "opportunity to add products to the bag for rep," *i.e.*, to leverage the fired sales force, and they could not be

---

[32] Exhibit E, at 11.

given "new opportunities and new products to put in their bag."

85.      On August 3, 2016, Defendants issued a press release, confirming a strategic

review and updating investors on its business.  The Release stated:

> CONCORDIA INTERNATIONAL CORP. CONFIRMS THAT STRATEGIC REVIEW IS ONGOING AND PROVIDES UPDATE ON ITS BUSINESS
>
> OAKVILLE, ON, Aug. 3, 2016 /CNW/ - Concordia International Corp. ("Concordia" or the "Company") (NASDAQ: CXRX) (TSX: CXR), an international pharmaceutical company focused on legacy pharmaceutical products and orphan drugs, today confirmed that its review of strategic alternatives is ongoing and provided an update on its business.
>
> Concordia disclosed on April 21, 2016, that it formed a special committee of independent members of the Board of Directors of the Company to consider various strategic alternatives potentially available to the Company.
>
> There can be no assurance that any transaction will occur. Concordia does not intend to make any additional comments at this time regarding various strategic alternatives potentially available to the Company.
>
> The Company today also provided an update on its business.
>
> *"We remain highly confident in our business prospects going forward,"* said Concordia Chairman and CEO Mark Thompson. *"We have a strong team across the world who help provide patients with important medicines. The team is supported by durable company fundamentals; Concordia has no liquidity or debt issues, a strong free cash profile, and sales channels in more than 100 countries. We remain optimistic about our long-term future*."[33]

86.      The foregoing statement was false and misleading because Defendants knew or

were reckless in not knowing, but failed to disclose that:

---

[33] *See* Exhibit F.

a.      Because they had caused their entire 75-80 person Donnatal contract sales force to be fired, evidencing their lack of commitment to the promotion of Donnatal, and the failure to generate prescriptions, the Company was not and could not be "highly confident in our business prospects;"

b.      Because many of the nation's biggest health care insurers, including three of the five largest, had already dropped Donnatal from their formularies in 2016, or had already decided to drop Donnatal from their formularies during 2016, the prospects for Concordia's most important drug were dim, and the Company was not and could not be "highly confident in our business prospects;"

c.      As laid out above, the Company had financed its slew of acquisitions with debt, and was highly dependent on maintaining sufficient cash flow.  Because cash flow from its largest product, Donnatal, was declining, a reality bolstered by the firing of the entire contract sales force, the Company did indeed have both "liquidity" issues and "debt issues."

## DISCLOSURES AT THE END OF THE CLASS PERIOD

87.      On August 12, 2016, at 7:00 a.m. EDT, Concordia issued a press release,[34] announcing that it was lowering its 2016 guidance "to reflect the impact of unexpected competition on several products in our North America segment, and current foreign currency exchange rates." The Company also announced that Adrian de Saldanha, Concordia's Chief Financial Officer, was leaving the Company, and that Concordia's Board unanimously agreed to suspend the Company's $0.075 quarterly dividend.  More completely, and in relevant part, the Company stated:

> **OAKVILLE, ON – August 12, 2016 –** Concordia International Corp. ("Concordia" or the "Company") (NASDAQ: CXRX) (TSX: CXR), an international pharmaceutical company focused on legacy pharmaceutical products and orphan drugs, today announced its

---

[34] Attached hereto as Exhibit G and incorporated herein by reference is the August 12, 2016 Press Release.

financial and operational results for the three and six months ended June 30, 2016. All financial references are in U.S. dollars unless otherwise noted.

"Our international segment continues to perform well as the team executes and delivers on its business plan," said Mark Thompson, Chairman and Chief Executive Officer of Concordia. "However, we have revised our 2016 guidance to reflect the impact of unexpected competition on several products in our North America segment, and current foreign currency exchange rates. Notwithstanding these revisions, we continue to maintain a strong free cash flow profile, our debt structure has no ongoing maintenance covenants and we are in compliance with all of our debt covenants. Furthermore, the business we have built reflects the value of having therapeutic and geographic diversity across our global platform. We remain committed to building a dynamic international specialty pharmaceutical company and driving long-term shareholder value."

**Second Quarter 2016 Highlights**

- Reported Concordia International segment revenue of $151.5 million, compared to $139.9 million in the first quarter of 2016. There were no comparative second quarter 2015 results for Concordia's International segment, which was acquired in the fourth quarter of 2015.

- Reported Concordia North America segment revenue of $77.5 million compared to $72.4 million in the second quarter of 2015.

*****

**Management Changes and Suspension of Dividend**

The Company announced today that Adrian de Saldanha, Concordia's Chief Financial Officer, will be leaving the organization to pursue other opportunities. Mr. de Saldanha will be replaced by Concordia's current Executive Vice President, Edward Borkowski. Mr. de Saldanha will remain with the Company during a transition period. The board of directors of the Company (the "Board") wishes to thank Mr. de Saldanha for his contributions to Concordia's growth.

As a result of his appointment as Chief Financial Officer, Mr. Borkowski will step down from his position on the Board.

\*\*\*\*\*

> Subsequent to quarter end, on August 11, 2016, Concordia's Board unanimously agreed to suspend the $0.075 dividend per common share, payable quarterly. The Company believes the dividend payments can be better deployed towards long- term value-creating initiatives or debt repayment.[35]

88.     On August 12, 2016, at 8:30am Eastern Time, before the opening of the market, Defendants convened a conference call to discuss these results. Among others, Defendants Borkowski, de Saldanha, Thompson and Kreppner participated in the conference call along with analysts Ridgeway, Stephen Stewart of Goldman Sachs & Co. ("Stewart"), Joel Hurren of RBC Capital Markets ("Hurren"), Gibbs, Martin Landry of GMP Securities ("Landry"), Common, Guan and Martin.[36]

89.     Defendants Borkowski stated in relevant part:

> I will talk about our guidance, operations, and liquidity; Adrian will discuss our financial results; and Mark will provide closing comments. As mentioned, we have revised our 2016 guidance for two primary reasons. We believe it was appropriate to reflect the significant changes on foreign exchange rates, primarily as a result of Brexit in our guidance. We've adjusted our forecast to reflect current exchange rates, which impacted our revenues by approximately $65 million and our adjusted EBITDA by about $38 million. And secondly, primarily due to increasing competitive pressures on key products in the U.S. business, we are forecasting a revision to revenues of approximately $101 million and adjusted EBITDA by approximately $62 million, inclusive of expense savings this year. Those savings are related to our third-party sales force and tech transfer expenses of approximately $22 million, which is now built into our revised guidance. My remarks will provide more information on both issues, and then I'll comment on macro themes for the consolidated business, including leverage and liquidity.

\*\*\*\*\*

---

[35] Exhibit G.

[36] Attached hereto as Exhibit H and incorporated herein by reference is the transcript of the August 12 Conference Call.

We were anticipating greater growth from Nilandron in the second-half of this year and beyond, which was the rationale for adding additional sales and marketing support for the product. We had initiated these sales and marketing efforts in the first quarter of this year. With the approval of the generic competitor, we are compelling our promotional efforts now that a generic launch and are preparing the launch of our own authorized generic. Concerning Donnatal, our adjunctive treatment for irritable bowel syndrome, we believe that competition within the therapeutic class will impede our ability to grow the asset in 2016. With new launches of IBS products, we are experienced competition for prescriptions, as healthcare providers evaluate new entrants.

Recent trends indicate that Donnatal is not being prescribed as frequently as we had anticipated, and we do not believe that, we will see the growth we expected from the additional sales efforts in the second-half of 2016. While our contract sales team has had success targeting traditional Donnatal prescribers, the sales team has had limited impact in growing the brand with doctors, who have not traditionally prescribed the drug.

We have also recently experienced the impact of a localized, regional, and in our view, illegal competitor Donnatal, which at this time has had a de minimis impact on sales. We are working to resolve this and have taken legal action against the third-party that has launched this product.

As a result, we are looking at options for our contract sales teams. We still believe in the value of promotional support for Donnatal, and in the near-term, we will continue to support the product and look for other opportunities for the sales force.

Our Plaquenil authorized generic has seen steep and rapid price erosion in the second quarter caused by an additional generic entrants signaling that they intend to participate in the market. Although this event did not significantly impact us until later in the second quarter, we anticipate the impact will be more pronounced in the second-half of the year.

Due to the generic competition for Nilandron and Plaquenil, we have adjusted the carrying value of these products by $567 million. Adrian will provide more detail on the adjustments in a moment, as well additional details for the adjustments in our second quarter

financial statements and MD&A.[37]

90.     Following up on several of these remarks, with respect to certain North American drugs, Defendant de Saldanha stated that "[a]s a result of launch of generic competitor Nilandron and competitive product pressures on Plaquenil previously discussed by Ed, both of which were figuring events for the second quarter, we have reassessed the carrying value of intangible assets associated with these products and recorded a total impairment of $567 million."[38]

91.     In colloquy between analyst Ridgeway and Defendants Borkowski and Kreppner about the overwhelming significance of the decline in Donnatal sales to the Company's bad news, the conversation included:

> Ridgeway: Hi, good morning, guys. Thanks a lot for taking the questions. I guess, I will start on the guidance revision. I think everybody was expecting a revision and – the currency side was as we were anticipating, I think the product revision side is greater than what we thought. So I was just wondering, is there any way you guys can provide us with a little bit more detail around the contribution to that $62 million EBITDA decrease as far as Nilandron, and Donnatal and Plaquenil along the lines of, sort of, what are you assuming for Nilandron now in the second-half and going forward? And how bad was the pricing impact on Plaquenil today? We knew there was a new competitor, but and I thought we had someone accounted for the pricing, but I don't think we've recounted enough? And then finally, if you could just give us on the Donnatal side, how big of a delta from your original budget is the new guidance?

> Borkowski: Hey, Al, this is Ed. I'll try to give a little color on what happened here and Wayne will fill in maybe on some of the economics of what's going on with – some of these products as well. I mean, of the – basically of the $100 million, I would say about half was related to what we saw in Donnatal in terms of the growth that we saw that we had originally projected to what we're seeing. And I would say, we're basically forecasting it to be roughly flat for the balance of the year and going forward. Nilandron was the next piece of that, and Plaquenil a little less was probably fairly small for this year. Although we understand that the – looking at the pricing going

---

[37] Exhibit H, at 2-3.

[38] Exhibit H, at 4.

forward was going to have a more significant impact into the future. So those were probably the key components of that. I don't know, whether, Wayne, you want to add any?

Kreppner: Yes, I think, I guess, the big driver there was Donnatal. We had obviously forecasted some significant growth in the second-half for Donnatal, based on our sales effort and our smart sales effort. And given where we're seeing Donnatal now, that sort of flat going forward, we've taken that growth out of the revised forecast going forward.

Ridgeway: Okay. So just Ed, so of the $100 – Ed, you said of the $100 million of the revenue decline, about half was – or ballpark half is Donnatal?

Borkowski: Correct.[39]

92.    In colloquy between analyst Gibbs and Defendant de Saldanha about the impact of other treatments on the sales of Donnatal, the conversation included:

Gibbs: Good morning, thanks. So the question pertains to the clinical and commercial argument for Donnatal in this new IBS market? On what basis do you expect Donnatal to be flat? What's the argument for that?

de Saldanha: Yes. Well, I think there is a prescriber base for Donnatal that is loyal to Donnatal and continues to prescribe[e]. And though that's the prescribing base that we originally targeted with our sales effort and we will continue to target as we move forward our sales effort.

Reminding them of the Donnatal product and ensuring that patients are getting Donnatal and it's – that's really been the focus of a sales effort and targeted promotion.

I think, our sales effort going forward was more about targeting doctors who weren't traditionally Donnatal prescribers, and trying to get expansion in that market. And that's what we're just not seeing the growth in that. However, when we talk about Donnatal being flat, we talk about being flat from where it is today. So we understand there's competitive pressure in the space. And we're hopeful our sales effort is going to be able to continue to grow Donnatal, but we're recognizing that it's flat going forward from where it is today.

---

[39] Exhibit H, at 7.

> Gibbs: Okay. And this is flat in terms of market share and you're fairly confident that it – that did not likely to see erosion from the newer product in terms of market share?
>
> de Saldanha: Yes. New – we see new products are growing the market rather than eroding Donnatal's share.[40]

93.     In colloquy between analyst Martin and Defendant de Saldanha about the exclusion of the Company's drugs from third-party payor formularies, the conversation included:

> Martin: Hi, thanks for taking my questions. First one, I'm wondering if any of your drugs in North America were aware of the C[V]S situation. But have any other major formularies excluded any of your drugs?
>
> *****
>
> Martin: Okay. And then the North America question?
>
> de Saldanha: To answer to that, this is the first example of where some of our products have been added to the exclusion list. It's a bit – it looks like in January that will take effect and that will have a very minimal impact on our business. Time to time we see changes here and there. But we generally have brought two or three coverage across our portfolio.[41]

94.     On these disclosures, Concordia' stock price fell $6.33 per share, or 38%, to close at $10.03 per share on August 12, 2016, on relatively large volume of 11,078,500 shares traded.

95.     In general, analysts responding negatively to Defendants' announcements, downgrading their ratings on Concordia stock.  For example, in and August 15, 2016 Report, downgrading Concordia to a "Hold," GMP analyst Landry wrote:

> CXRX reported Q2/16 results on Friday that were mostly in line with our expectations and consensus which had been revised downward in recent weeks. What surprised investors was the 31%

---

[40] Exhibit H, at 9-10.

[41] Exhibit H, at 13.

YoY decline in sales of Donnatal, which was a main culprit for the downward revision in the company's guidance, and new entrants to compete with Plaquenil AG. Donnatal's sales decline has been sudden and may have been caused in part by the entrance of Viberzi from Actavis, which was launched in Q1/16 and saw sales accelerate in Q2/16. In addition, the company announced a large impairment charge of $567m, to reflect the generic competition for Nilandron (expected) and Plaquenil (not expected). This announcement comes 10 days after the company issued a press release indicating being confident in its business prospects going forward.

We are changing our rating to a HOLD on CXRX for the following reasons:

1. Cloudy outlook in North America. CXRX's portfolio in North America is currently challenged with major products such as Donnatal, Plaquenil AG and Nilandron expected to be down materially YoY for the next 12 months. It is unclear what actions will be taken to stabilize Donnatal's scripts.

2. Increased leverage above 6x EBITDA. The revised guidance translates into an expected leverage at year end of 6.4x vs 5.5x previously. We believe this high leverage may leave most investors on the sidelines.

3. Growth outlook materially changed. Our revised forecasts are calling for EBITDA to decline 3% YoY (vs an increase of ~7% previously) and cash EPS to be stable YoY vs up 16% previously. This is a material change in CXRX's growth outlook and is due to the headwinds faced by its US portfolio.

*****

What's changed in the outlook?

Our previous investment thesis on Concordia was predicated on the company's valuation being impacted by the negative headlines in the specialty pharma sector, including Valeant Pharmaceuticals, which kept most investors on the sidelines. We were expecting that this sentiment would be temporary and that investors would return to the sector at some point. In fact, investors have returned to the sector, as exhibited by peers rebounding from their recent lows. Valeant (VRX-NYSE, not rated) is up 33% from its low, Endo International (ENDP-NASDAQ, not rated) is up 77% and Mallinckrodt (MNK-NYSE, not rated) is up 49%. On the other hand, Concordia hit new lows on Friday due to company-specific

issues that were unexpected.

Company-specific issues arising. ***While Concordia has been highly levered in the last year, we did not have concerns on its cash flow generating ability. In fact, we were seeing the company's cash flows as fairly stable in local currency. However, on Friday, this changed with the unexpected decline in sales of Donnatal resulting in a concerning outlook***. In addition, we did not expect new generic entrants this early for Plaquenil AG. The large impairment charge on Plaquenil AG would suggest that new entrants have wiped out most of the profitability of this product, quite a sudden turn of events for a product that was exhibiting strong growth until recently. Finally, in July, a generic entered the market for Nilandron, a product that had been commercialized for almost 20 years.

Rapid change of events blurs the outlook. These events occurred in a short time period and materially changed the outlook of the company. While the company is bringing down its FY16 EBITDA guidance by ~16%, the impact on an annual basis is larger as these changes occurred midyear 2016. Hence, we estimate that the earnings power of the company has decreased by almost 30% in a short period. Management has not been clear as to the possible steps to mitigate these commercial headwinds. Hence, this leaves us with concerns on the outlook for the portfolio in North America, where three main products are experiencing significant headwinds.

*****

Noteworthy items this quarter

*****

Donnatal sales growth not materializing. Donnatal sales eroded ~31% YoY in Q2/16. ***Concordia was expecting to drive sales growth from new prescribers through a dedicated sales team***. However, according to management, while growth from existing prescribers is relatively flat, they are not seeing the anticipated growth from new prescribers. This is likely due to physicians trying new therapies, as we are seeing scripts for Xifaxan and Viberzi, two new IBS products, ramp-up in 2016.  (Emphasis added).[42]

---

[42] Attached hereto as Exhibit I and incorporated herein by reference is GMP analyst Landry's Report.

96.     In his August 14, 2016 Report, CIBC analyst Gowd also downgraded Concordia, expressing concern that a weakened U.S. business would adversely affect cash flows, and, in turn, jeopardize the Concordia's repayment of its debt.  Gowd wrote:

What's The Event

We are downgrading our rating and price target after Concordia lowered its guidance, suspended the dividend, and announced the departure of its CFO. While we expected a guidance revision, the magnitude was surprising, raising the spectre of debt repayment issues in the future.

Implications

* The US business is even weaker than we initially feared, declining almost 10% q/q, reflecting challenges across the portfolio.

* The company lowered 2016 guidance (Rev: $859MM-$888MM from $1,020MM-$1,060MM; EBITDA: $510MM-$540MM from $610MM-$640MM) due to FX changes and competitive issues in the U.S.

*****

* The U.S. legacy business will remain significantly challenged as generics erode the market share of some of its top drugs, and the pricing/reimbursement environment remains unfriendly. We do not expect a recovery in the U.S.

*****

* To save money, Concordia suspended its quarterly dividend ($0.075/share), and will need to scale back its US contract salesforce starting in Q1/17 when it is contractually feasible.

* We are concerned that cash flow for debt repayment may become an issue in the future when mandatory payments start in Oct/2021.

*****

Highlighting Debt Repayment Risk

Based on our estimates, we believe Concordia will have difficulty in meeting its debt obligations when they start coming due in 2021.

We have modeled our forward-looking debt, interest and purchase consideration payments closely based on the schedule provided by the company in its latest MD&A. In spite of that, we expect the company to face a cash shortfall of $170M when $1.66B of term loans come due in Q4/21. An expected total cash shortfall of over $500M could prevent Concordia from fulfilling its full obligations to its creditors.[43]

## CLASS ACTION ALLEGATIONS

97.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities that  acquired Concordia securities on U.S. Exchanges or in U.S. transactions between May 13, 2015, through August 12, 2016, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

98.      The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Concordia' common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Concordia shares were traded publicly during the Class Period on the NASDAQ. As of December 31, 2015, Concordia had approximately 50 million common shares outstanding.  Record owners and other members  of the Class may be identified from records maintained by Concordia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

---

[43] Attached hereto as Exhibit J and incorporated herein by reference is CIBC Analyst Gowd's Report.

99.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

100.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

101.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Concordia; and

c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

102.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

103.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Concordia, his/her control over, and/or receipt and/or modification of Concordia' allegedly materially misleading misstatements    and/or their associations with the Company which made them privy to confidential proprietary information concerning Concordia, participated in the fraudulent scheme alleged herein.

104.    On April 21, 2016, at 1:31pm EDT, *Bloomberg* writers Manuel Baigorri, Devin Banerjee, Scott Deveau and Kiel Porter posted a story titled "Blackstone Said to Weigh Buyout of Concordia Healthcare."  They updated the story at 5:17pm, stating:

> Blackstone Group LP is considering a takeover of listed Canadian pharmaceutical company Concordia Healthcare Corp., according to people familiar with the matter.
>
> The buyout firm is in talks with Concordia about a potential transaction, the people said, asking not to be identified as the discussions are private. Talks are at an early stage and a deal may not happen, they said. Other bidders may also be interested in acquiring Concordia, they said.
>
> Toronto-based Concordia said in a statement after the market closed that it has formed a special committee of the board to consider strategic alternatives.
>
> "The company has had discussions, however, there can be no assurance that any transaction will occur," it said in the statement.
>
> Shares in Concordia rose as much as 28 percent before trading was halted at 1.52 p.m. in Toronto pending news. They closed at C$30.86, valuing the company at about C$2 billion ($1.6 billion).
>
> Shares of specialty pharmaceuticals companies also rose. Horizon Pharma Plc climbed as much as 10 percent, Endo International Plc gained as much as 13 percent and Mallinckrodt Plc increased as

much as 6.4 percent.

A spokeswoman for Blackstone declined to comment.

Acquisition Spree

Concordia last year agreed to buy Amdipharm Mercury Ltd. in a deal valued at about $3.5 billion, part of an acquisition spree that's seen it spend almost $5 billion on transactions since 2013. Its growth-by-acquisition strategy has drawn comparisons with that of its larger peer Valeant Pharmaceuticals International Inc.

In a related transaction, it agreed to sell a 14 percent stake to buyout firm Cinven in October.

Chief Executive Officer Mark Thompson said at the time the Amdipharm deal would give the drugmaker the global scale it needs to go after larger targets. Thompson worked for Biovail Corp. before its 2010 merger with Valeant.

Short Sellers

Concordia shares have fallen more than 73 percent since the Amdipharm acquisition -- its largest to date -- after investors grew concerned about its debt levels and the company became a target for short sellers.

The company also got caught up the wake of the crisis at Valeant and the increased scrutiny on the health-care sector. Several U.S. officials have criticized the industry, including U.S. presidential candidate Hillary Clinton, who has promised stricter regulations on what she called "predatory pricing" on prescription drugs.

"Concordia has been the subject of an unrelenting and unscrupulous attack by a group of short sellers for several months," CEO Thompson said in a statement last month. "We will continue to monitor this situation and will act accordingly. However, we are extremely excited about the business we have built and the opportunity to deliver long-term shareholder value."[44]

---

[44] Attached hereto as Exhibit K and incorporated herein by reference is the April 21, 2016 Bloomberg article.

105.     In response to the *Bloomberg* post, on April 21, 2016, the Company issued a press release, titled "Concordia Healthcare Announces Formation of Special Committee to Review Strategic Alternatives," stating, in relevant part, "it has formed a special committee of independent members of the Board of Directors of the Company (the "Special Committee") to consider various strategic alternatives potentially available to the Company."  The Company concluded that it "has had discussions, however, there can be no assurance that any transaction will occur.  Concordia does not intend to make any additional comments at this time regarding various strategic alternatives potentially available to the Company."[45]

106.     On June 2, 2016, the Company issued a press release, stating:

> CONCORDIA HEALTHCARE CONFIRMS THAT REVIEW OF STRATEGIC ALTERNATIVES ONGOING
>
> OAKVILLE, ON, June 2, 2016 /CNW/ - Concordia Healthcare Corp. ("Concordia" or the "Company") (NASDAQ: CXRX) (TSX: CXR), an international pharmaceutical company focused on legacy pharmaceutical products and orphan drugs, confirmed today that its review of strategic alternatives is ongoing.
>
> Concordia disclosed on April 21, 2016, that it formed a special committee of independent members of the Board of Directors of the Company to consider various strategic alternatives potentially available to the Company.
>
> There can be no assurance that any transaction will occur. Concordia does not intend to make any additional comments at this time regarding various strategic alternatives potentially available to the Company.[46]

---

[45] Attached hereto as Exhibit L and incorporated herein by reference is the April 21, 2016 Press Release.

[46] Attached hereto as Exhibit M and incorporated herein by reference is the June 2, 2016 press release.

107.    On June 2, 2016, Amy Or ("Or") of *The Wall Street Journal* posted an article, titled "Blackstone, Carlyle Depart Concordia Healthcare's Sale Process."[47]  Or reported that "[t]wo private-equity giants have walked away from the auction process of Concordia Healthcare Corp., on concerns that the Food and Drug Administration's efforts to speed up drug approval processes may hurt the Canadian pharmaceutical company's earnings, people familiar with the situation said."  Further, according to Or, Concordia had set Tuesday, May 31, 2016 as the deadline for "final bids for Concordia."  According to Or's sources, Blackstone Group LP and Carlyle Group LP, determined not to submit bids to purchase Concordia.  Or sought but received not comment from Concordia, noting only the Company's June 2, 2016 statement that its review of strategic alternatives was ongoing.  Or continued that:

> Concordia, based in Oakville, Ontario, focuses on orphan drugs and legacy pharmaceutical products, and has a $1.58 billion market capitalization based on its current share price. At its scale, Concordia presents cash-flush health-care investors a rare chance to put a sizable amount of capital to work.

> But investors who have looked at the asset said there are concerns about Concordia's ability to maintain its profitability in light of the FDA's efforts to create more competition in the pharmaceutical industry and curb rising drug prices. In the wake of Valeant Pharmaceuticals International Inc.'s strategy of buying drugs and increasing prices, and the resulting public outcry, the FDA in March said it would expedite the approval process for drug products, particularly for generics made by a single manufacturer.

> One of Concordia's main products that potentially could be affected by having a competitor in the market is Donnatal, a line of drugs used as an adjunct therapy to treat irritable bowel syndrome and acute enterocolitis and the only line of such products available for prescription. Analysts from RBC Capital Markets said in a January note that Donnatal—available by prescription in immediate-release tablet and fast-acting elixir formats—is expected to generate 10% or about $102 million of Concordia's revenue.

---

[47] Attached hereto as Exhibit N and incorporated herein by reference is the June 2, 2016 *The Wall Street Journal* article.

Potential investors who have looked at Concordia said it is not only Donnatal that may be exposed to potential regulatory risks, but also other drugs in its portfolio.

Concordia has raised prices after acquiring new drugs. The company raised Donnatal prices by 100% in 2014 after it acquired the rights to the drug, according to court documents filed with the U.S. District Court in Charlottesville, Va., when Concordia sued Method Pharmaceuticals LLC over false advertising claims.

Concordia has been acquisitive over the past few years in building its portfolio of pharmaceutical products, orphan drugs and medical devices. In September, it announced what it described as a "transformational" deal in buying U.K.-based Amdipharm Mercury Ltd. from European private-equity firm Cinven for about $3.5 billion including debt.

Among other notable purchases were the Donnatal drug line, bought in 2014 for $200 million in cash and about $65 million in shares, and certain assets of Cerberus Capital Management LP-backed Covis Pharma Holdings Sarl for $1.2 billion last year.

The company said in its first-quarter earnings report it expects to record $1.02 billion to $1.06 billion in revenue and $610 million to $640 million in adjusted earnings before interest, taxes, depreciation and amortization this year, against 2015's $394.2 million in revenue and $265.7 million in adjusted EBITDA.

108.    In the Company's August 12, 2016 press release, they disclosed the dismissal of

Defendant de Saldanha, stating:

### Management Changes and Suspension of Dividend

The Company announced today that Adrian de Saldanha, Concordia's Chief Financial Officer, will be leaving the organization to pursue other opportunities. Mr. de Saldanha will be replaced by Concordia's current Executive Vice President, Edward Borkowski. Mr. de Saldanha will remain with the Company during a transition period. The board of directors of the Company (the "Board") wishes to thank Mr. de Saldanha for his contributions to Concordia's growth.

> As a result of his appointment as Chief Financial Officer, Mr.
> Borkowski will step down from his position on the Board.[48]

109.    On August 22, 2016, Defendants issued a press release, disclosing that Defendant

Thompson had sold 505,000 shares of Concordia stock in a "margin call." The press release stated

in relevant part:

> OAKVILLE, ON – August 22, 2016 – Concordia International
> Corp. ("Concordia" or the "Company") (NASDAQ: CXRX) (TSX:
> CXR), an international pharmaceutical company focused on legacy
> pharmaceutical products and orphan drugs, stated that Concordia's
> Chairman and Chief Executive Officer Mark Thompson was
> notified earlier today of the sale of 505,000 of his shares as part of a
> margin call.
>
> These shares were not granted to Mr. Thompson as compensation.
> The shares were pledged to secure loans made to Mr. Thompson,
> and the sales terms were agreed upon, prior to the Company's April
> 21, 2016 announcement that it had formed a Special Committee to
> evaluate strategic alternatives. The financial institution executed the
> share sale after Concordia's common shares declined below a
> certain market price. Mr. Thompson continues to hold 1,620,251
> shares of Concordia.
>
> "It is with great regret that I have been forced to sell shares in
> Concordia," said Mark Thompson, Chairman and Chief Executive
> Office of Concordia. "Since founding Concordia three years ago, I
> participated in the initial equity offering and two subsequent
> financings and invested further last fall. This sale in no way
> diminishes my confidence in Concordia's business and prospects."
>
> Concordia's senior management team is currently in a blackout
> period until the conclusion of the review of strategic alternatives and
> cannot proactively sell or buy shares at this time.[49]

110.    Thus, unbeknownst to investors, prior to the Class Period, Defendant Thompson

had encumbered his shares, using them as collateral. During the Class Period, therefore, he was

---

[48] *See* Exhibit G.

[49] Attached hereto as Exhibit O and incorporated herein by reference is the Company's August 22,
2016 press release.

highly motivated to maintain the price of Concordia stock to avoid the margin call that ultimately forced him to sell those shares.

111.     On October 21, 2016, Concordia issued a press release, disclosing that Defendants Thompson would leave the Company as both its CEO and as a Director.[50]  Lead Independent Director, Jordan Kupinsky ("Kupinsky"), stated that Defendant Thompson and the Board of Directors "agreed that this would be the ideal time for a leadership change at the Company and the Board thanks him for his significant contribution over the years."  The Company indicated that it was searching for a replacement.  According to Kupinsky, "[t]his is an important juncture for Concordia.  We recently closed a very successful US$350 million debt offering and completed a strategic review of the business."  He concluded, that "[w]ith a portfolio of more than 200 products, a platform for continued international expansion, a strong commercial footprint and opportunities for organic growth, we look forward to building on our past successes."

## **LOSS CAUSATION**

112.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

113.     During the Class Period, Plaintiff and the Class purchased Concordia' securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

---

[50] Attached hereto as Exhibit P and incorporated herein by reference is the Company's October 21, 2016 press release.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE AND *AFFILIATE UTE* PRESUMPTION)**

114.     The market for Concordia' securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Concordia' securities traded at artificially inflated prices during the Class Period. On December 28, 2015, the Company's stock price closed at a Class Period adjusted high of $41.31 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Concordia' securities and market information relating to Concordia, and have been damaged thereby.

115.     During the Class Period, the artificial inflation of Concordia' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Concordia' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Concordia and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

116.     At all relevant times, the market for Concordia' securities was an efficient market for the following reasons, among others:

    a.     Concordia stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer in both the U.S. and Canada, Concordia filed periodic public reports with both the SEC and the Canadian Securities Administrators, available on its SEDAR website;

c.      Concordia regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.      Concordia was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Analysts included, without limitation, Doug Cooper of Beacon Securities, Dave Martin of Bloom Burton & Co., Neil Maruoka of Canaccord Genuity, Prakash Gowd of CIBC World Markets, Martin Landry of GMP Securities, Stephan Stewart of Goldman Sachs & Co., Joseph Walewicz of Laurentian Bank Securities, Douglas Miehm of RBC Capital Markets, Alan Ridgeway of Scotiabank and Lennox Gibbs of TD Securities.

e.      The price of Concordia's stock reacted to the release of new, material, company-specific information.

f.      At the beginning of the Class Period, Concordia's market capitalization or the total value of all outstanding shares was approximately $1,170,814,262.[51]

g.      As of March 31, 2016, just before the Class Period, Concordia reported shares outstanding of 51,015,872 shares. As of May 13, 2016, the beginning of the Class Period,

---

[51] The market capitalization is derived by multiplying the closing price on May 12, 2016, the trading day before the Class Period, $22.95, by the number of shares outstanding as of March 31, 2016, 51,015,872.

Concordia's equity float, or the number of shares outstanding, less shares held by insiders and affiliated corporate entities was approximately 43.90 million shares.

        h.    Average daily trading volume of Concordia shares during the Class Period was 571,525.

117.    As a result of the foregoing, the market for Concordia' securities promptly digested current information regarding Concordia from all publicly available sources and reflected such information in Concordia' stock price. Under these circumstances, all purchasers of Concordia' securities during the Class Period suffered similar injury through their purchase of Concordia' securities at artificially inflated prices and a presumption of reliance applies.

118.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' omissions of material facts. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward- looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Concordia who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

120.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

121.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Concordia' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

122.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Concordia' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

123.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Concordia' financial well-being and prospects, as specified herein.

124.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Concordia' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to  state material facts necessary in order to make the statements made about Concordia and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

125.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

126.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Concordia' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

127.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Concordia' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the

market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Concordia' securities during the Class Period at artificially high prices and were damaged thereby.

128.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Concordia was experiencing, which Defendants knowingly or recklessly failed to disclose, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Concordia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

129.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

130.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange
### Act against the Individual Defendants

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.    The Individual Defendants acted as controlling persons of Concordia within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements that Plaintiffs allege were false or misleading prior to and/or shortly after  these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

133.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

134.    As set forth above, Concordia and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

      b.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      c.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      d.     Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: December 8, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

_____/s/ *Phillip Kim*_____
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

*Counsel for Plaintiffs and Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of December, 2016, I caused a true and correct copy of the foregoing **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**, to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Phillip Kim*