**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/28/17
```

ANDREW MEYER, Individually and on behalf of
all others similarly situated,

Plaintiff,

-against-

CONCORDIA INTERNATIONAL CORP.,
MARK THOMPSON, ADRIAN DE
SALDANHA, EDWARD BORKOWSKI and
WAYNE KREPPNER

Defendants.

<u>**DECISION & ORDER**</u>

16 Civ. 6467 (RMB)

## I.    Background

This Decision & Order resolves the motion, dated February 20, 2017, of Concordia

International Corp. ("Concordia" or the "Company"), Mark Thompson, the former Chairman of

the Board of Directors and Chief Executive Officer ("CEO") ("Thompson"), Adrian de

Saldanha, the former Chief Financial Officer ("CFO") ("Saldanha"), Edward Borkowski, an

Executive Vice President and Director ("Borkowski"), and Wayne Walter Kreppner, the

President and Chief Operating Officer ("COO") ("Kreppner") (together with Thompson,

Saldanha, and Borkowski, the "Individual Defendants," and, together with the Company, the

"Defendants"), to dismiss the Consolidated Amended Class Action Complaint, filed December 8,

2016 ("Amended Complaint" or "Complaint") of lead plaintiff Tony Bernardo ("Bernardo") and

plaintiffs Bryan Boothby and Elise Kern (collectively, "Plaintiffs"). The Amended Complaint

alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a)

of the Exchange Act, 15 U.S.C. § 78t(a). (Am. Compl. ¶¶ 14, 120-134.)

1

**Concordia and the Drug Donnatal**

Concordia is a Canadian-based "specialty pharmaceutical company" offering a portfolio of branded and generic pharmaceuticals. (Am. Compl. ¶ 2.) In late 2013, Concordia allegedly began a "[b]inge" of "debt-fueled" acquisitions of licenses to market and sell drugs not already in its portfolio. (Id. ¶¶ 3, 5, 30-35.) In March 2014, Concordia acquired the rights to the drug Donnatal from PBM Pharmaceuticals, Inc. for $200 million in cash and 4.6 million of the Company's shares. (Id. ¶¶ 4, 31.) By December 31, 2015, Concordia was carrying $3.3 billion in long-term debt (a 1400% increase from 2014) and was obligated to make interest payments of over $91 million per year (a 1700% increase from 2014). (Id. ¶ 35.)

Plaintiffs allege that Donnatal "represented 33.9% of the Company's North America segment's revenue and at least 10% of its total revenue, Company-wide." (Id. ¶ 7.) "[A]ll generic competitors [had] left the market" by March 2014, and the Company marked up the per prescription price from $353 to $782. (Id. ¶¶ 6, 39 & n.11.)

On March 23, 2016, Concordia disclosed that it had contracted with Ashfield Healthcare ("Ashfield") "toward the end of 2015 and continuing into 2016" for "75-80 pharmaceutical sales representatives to market Donnatal in the United States," representing roughly half of Concordia's total 175-person sales force. (Id. ¶ 50.) Plaintiffs claim that Defendants also caused those 75-80 salespeople to be fired on May 13, 2016, with no public explanation provided for the terminations. (Id. ¶ 53.)

In or about April 2016, private equity concerns expressed interest in buying Concordia. (Id. ¶¶ 104-07.)[1] Concordia "set . . . May 31, 2016 as the deadline for final [acquisition] bids."

---

[1] According to Thompson, from and after approximately October 2015, "Concordia ha[d] been the subject of an unrelenting and unscrupulous attack by a group of short sellers for several months." (Am. Compl. ¶ 107, Ex. C-7 at 8.)

(Id. ¶ 107 (internal quotation marks omitted).) The Amended Complaint alleges that Defendants sought to "project a positive picture of [the Company's] cash flows—in particular from its most important, revenue-producing drug, Donnatal." (Id. ¶ 8.) By June 2, 2016, two potential buyers, Blackstone Group LP and Carlyle Group LP, had "walked away from the auction process," citing "concerns about Concordia's ability to maintain its profitability." (Id. ¶ 107.)

Sometime before April 21, 2016, Thompson "pledged more than 2 million shares of [his] Concordia common stock to secure personal loans." (Id. ¶ 8.)

### The Alleged Misrepresentations and Omissions by Concordia

By May 13, 2016, both Aetna Group—one of the "five largest private health insurers in the United States"—and Horizon Blue Cross/Blue Shield of New Jersey had announced that Donnatal would no longer be covered in their respective prescription drug formularies. (Id. ¶¶ 1, 44, 46, 48, 67.)[2] Starting on July 1, 2016, UnitedHealthcare also stopped covering Donnatal. (Id. ¶ 45.) As of at latest November 2016, Humana Group also stopped covering Donnatal. (Id. ¶ 47.) Plaintiffs allege Defendants were in contact with third-party payors in 2016 regarding the inclusion of Concordia drugs on their formularies and "had access to, and accessed, independent means of verifying" coverage. (Id. ¶ 43.)

On May 13, 2016, the Individual Defendants participated in an earnings call with analysts ("May 13 Conference Call"). (Id. ¶ 74.) Kreppner was asked on the call: "[C]an you talk a little bit about . . . any changes on the reimbursement front on Donnatal, are they positive or

---

[2] As stated in Concordia's December 31, 2015 Annual Information Form, "Failure to be included in . . . formularies or to achieve favourable formulary status may negatively impact the use of the Corporation's products. If the Corporation's products are not included within an adequate number of formularies or adequate reimbursement levels are not provided, the Corporation's market share and gross margins could be adversely impacted, which could have a material adverse effect on the Corporation's business, financial condition and results of operations." (Am. Compl, Ex. C-5 at 58.)

negative?" (Id. ¶ 77.) Kreppner answered, "No, nothing that we've seen, there has been changes over time on Donnatal due to its regulatory status, **but nothing other than that**." (Id. (emphasis added).) Defendant Saldanha stated on the Call that Donnatal hadn't "experienced any pricing pressure. It is business as usual." (Id. ¶ 81 (emphasis removed).)

Also, during the May 13 Conference Call, no mention was made by Defendants about the May 13, 2016 firing of 75-80 members of Concordia's Donnatal sales force. In fact, Borkowski stated that the "175 person sales team continued to make progress with Donnatal. . . . [The] sales team is executing our initiatives and we expect the impact will ramp up during the next two quarters." (Id. ¶ 56.) Borkowski also stated, "we expect[,] as it has in the past[,] Donnatal will respond to our promotional efforts in the coming months." (Id. ¶ 75.) In response to a query about whether Concordia was "committed to the promotion [of Donnatal] for at least another quarter or two," Borkowski said that "there is no reason at this point to do anything different." (Id. ¶ 79 (emphasis removed).)

On August 3, 2016, Defendants issued a press release stating, among other things, that "Concordia has no liquidity or debt issues." (Id. ¶ 85 (emphasis removed).) And, on August 12, 2016, the Company published its second quarter results and the Individual Defendants participated in an earnings call with analysts ("August 12 Conference Call"). (Id. ¶ 88.) **Concordia announced that Donnatal sales in the second quarter of 2016 were 31% less than sales in the second quarter of 2015, and almost 10% less than sales in the first quarter of 2016.** (Id. ¶¶ 59-60, 96.) The Company also announced the resignation of Defendant Saldanha. (Id. ¶ 87.) And, Borkowski announced that the Company was "forecasting a [downward] revision to revenues of approximately $100 million." (Id. ¶ 89.) He attributed "about half" of the decline in revenues "to what we saw in Donnatal." (Id. ¶ 91.) Kreppner agreed that

"the big driver there was Donnatal." (Id.)  Kreppner also attributed the Company's more optimistic initial forecast to "our sales effort and our smart sales effort" for Donnatal. (Id. ¶ 10 (emphasis removed).) Neither Kreppner nor Borkowski referenced the 75-80 salesforce terminations when discussing the Donnatal "sales effort." (Id. ¶¶ 63-64.)

Following the August 12 Conference Call, "Concordia's stock price fell $6.33 per share, or 38%, to close at $10.03 per share on August 12, 2016, on relatively large volume of . . . shares traded." (Id. ¶ 94.) On August 22, 2016, Concordia disclosed that Thompson was "forced to sell . . . 505,000 of his [Concordia] shares as part of a margin call." (Id. ¶ 109.)

**Motion to Dismiss**

On February 20, 2017, Defendants moved to dismiss the Amended Complaint, arguing, among other things, that: **(A)** Plaintiffs fail to plead material misrepresentations or omissions relating to the Donnatal salesforce, the Donnatal formulary coverage, or the August 3, 2016 press release (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, dated Feb. 20, 2017 ("Def. Mem."), at 6-9, 17-19, 21-25); **(B)** Plaintiffs fail to allege scienter because they do not "state with particularity facts giving rise to a strong inference that the [Defendants] acted with . . . a mental state embracing intent to deceive, manipulate, or defraud" (id. at 2-3, 14-25); **(C)** Plaintiffs fail to plead loss causation because they do not "show that the stock price would have reacted differently had Concordia . . . disclosed personnel changes during the May 13 call" (id. at 25); and **(D)** Plaintiffs' "control person" claims against the Individual Defendants fail because Plaintiffs do not allege "a primary violation or 'culpable participation' by any Defendant" (id. at 25).

On March 21, 2017, Plaintiffs submitted an opposition brief, arguing, among other things, that: **(A)** the "Complaint identifies each false statement or omission . . . describing why

each was false with particularity by reference to the narratives that render each statement or omission false" (Pls.' Mem. of Law in Opp'n to the Mot. to Dismiss, filed Mar. 21, 2017 ("Opp'n"), at 5); **(B)** the Complaint adequately pleads scienter by "alleg[ing] both 'motive and opportunity to commit the fraud' and 'strong circumstantial evidence of conscious misbehavior or recklessness'" (id. at 16); **(C)** the Complaint adequately pleads loss causation by alleging "that the subject matter of the fraudulent statement[s] or omission[s] was the cause of the actual loss suffered" (id. at 24); and **(D)** "the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5" and culpable participation by Defendants (id. at 25).

On April 5, 2017, Defendants submitted their reply. (Defs.' Reply in Supp. of Mot. to Dismiss, dated Apr. 5, 2017 ("Reply").) Helpful oral argument was held on July 18, 2017. (See Hr'g Tr., dated July 18, 2017.)

**For the reasons stated herein, Defendants motion to dismiss [#52] is granted in part and denied in part.**

## II.     Legal Standard

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014).

A misstatement or omission of fact is material if there is a "substantial likelihood" that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 235. Materiality is "a mixed question of law and fact" that is "rarely dispositive in a motion to dismiss." Id. (internal quotation marks omitted). A

complaint "may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id. (ellipsis omitted).

"[T]he standard on a motion to dismiss is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2d Cir. 2015) (emphasis and internal quotation marks omitted).

As to loss causation, "[a]t the motion to dismiss stage, the complaint need not rule out all competing theories for the drop in stock price; that is an issue to be determined by the trier of fact on a fully developed record." Carpenters Pension Trust, 750 F.3d at 233 (brackets, ellipsis, and internal quotation marks omitted).

"Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." In re Inv. Tech. Grp., Inc. Sec. Litig., 2017 WL 1498055, at *20 (S.D.N.Y. Apr. 26, 2017) (alteration omitted).

### III.  Analysis

#### (A) The Complaint Adequately Pleads Material Misrepresentations and Omissions

Defendants argue that the omission of the termination on May 13, 2017 of 75-80 Ashfield salespersons (hired by Concordia to sell Donnatal) was immaterial because Borkowski "repeatedly cautioned investors that Concordia's marketing efforts for Donnatal[] were in their early stages," and "Concordia increased total marketing expenditures" between the first and second quarters of 2016. (Def. Mem. at 6-9, 18-20; Reply at 2-5). Defendants contend that "[t]here are no particularized allegations showing that the UnitedHealthcare, Humana, and

Horizon Blue Cross/Blue Shield changes occurred before May 13," and "[t]he Aetna change [which took effect on January 1, 2016] occurred prior to the previous earnings call and was public knowledge." (Def Mem. at 22-23; Reply at 5.) Defendants also argue that the statements in the August 3, 2016 press release were immaterial because, among other reasons, they were "puffery," and "[t]he press release . . . warned it contained forward-looking statements that were subject to various risks." (Def. Mem. at 11-13, 23-25; Reply at 5-6.)

Plaintiffs respond persuasively that the termination of 75-80 Donnatal salespersons on or about May 13, 2016 was material because, among other reasons, Donnatal was "Concordia's most important drug." (Opp'n at 6-11.) Plaintiffs argue that the formulary exclusions by Aetna, Horizon Blue Cross/Blue Shield, UnitedHealthcare, and Humana Group were material because, among other reasons, Defendants "provide no evidence that the [formulary] change[s] w[ere] widely publicized." (Id. at 11-14.) Plaintiffs also contend that the statements in the August 3, 2016 press release were material because Defendants "knew very well that the Company would be facing a serious cash crunch." (Id. at 14-16.)

### The Donnatal Salesforce

Defendants have not persuaded the Court at the motion to dismiss stage that terminating 43% of its salesforce which accounted for over 10% of Concordia's revenue was immaterial, or that the terminations were "so obviously unimportant to a reasonable investor that minds could not differ on the question of [its] importance." See Carpenters Pension Trust, 750 F.3d at 235 (quotations and citation omitted). This omission had particular significance because of Concordia's voluntary disclosure on March 23, 2016 (less than two months prior to the salesforce terminations) that "[t]he Company began to expand its salesforce with respect to Donnatal[] toward the end of 2015 and continuing into 2016," and Borkowski's statements on

8

May 13, 2016 that the "175 person sales team continued to make progress with Donnatal. . . . [The] sales team is executing our initiatives and we expect the impact will ramp up during the next two quarters" (Am. Compl. ¶¶ 50, 56). See Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." (citations omitted)); Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 177, 185-86 (S.D.N.Y. 2010) (statement that mortgage lender had "strict discipline with respect to risk mitigation, all the way down to the level of the borrower" was materially misleading in light of undisclosed firing of "most mortgage loan and credit review personnel" (internal quotation marks omitted)); In re Credit-Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34, 41, 58 (D. Mass. 2006) (layoff that was even "medium in terms of severity" was "just the sort of information that drives stock prices down") (quotations omitted).

Defendants (unpersuasively) cite cases in an effort to demonstrate that the 75-80 salesforce terminations were not material, but materiality is "fact-specific" and "rarely . . . dispositive in a motion to dismiss." See Carpenters Pension Trust, 750 F.3d at 235. For example, in In re Boston Scientific Corp. Securities Litigation, the First Circuit U.S. Court of Appeals found the termination of 10 salespersons—which was less than 2% of a 1,100-person salesforce—was not material. 686 F.3d 21, 28-29 (1st Cir. 2012). But, the facts of Boston Scientific are clearly distinguishable from Plaintiffs' allegations particularly regarding the termination of 75-80 salespersons out of a total of 175, which represented at least 43% of the Company's total Donnatal salesforce. (Am. Compl. ¶¶ 4, 7, 9, 50.)

The alleged misstatements and omissions are not cured by any of Defendants' assertedly cautionary statements, such as statements about Donnatal's "renewed process . . . taking effect slowly" or the Company's potential problems with third parties. (Def. Mem. at 5, 8.)  These

statements are not "sufficiently specific to render reliance on the false or omitted statement unreasonable." See In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004). And, even "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." City of Providence v. Aeropostale, Inc., 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 25, 2013) (citation, alteration, and internal quotation marks omitted).

Plaintiffs successfully allege upon this motion to dismiss that the Company failed to disclose that it had terminated 43% of its salesforce which was "critical to Concordia's cash flow and, in turn, its liquidity" (Am. Compl. ¶ 7). See Providence, 2013 WL 1197755, at *14.

### Formulary Exclusions of Donnatal

Defendants fail to establish that the seemingly significant decisions of third-parties to terminate or decrease their formulary coverage of Donnatal are not material. See Carpenters Pension Trust, 750 F.3d at 235. Defense counsel conceded at oral argument, on July 18, 2017, that Aetna's formulary change on January 1, 2016 "was not disclosed by the company." (H'rg Tr., dated July 18, 2017, at 15:21.)[3] Defendants also argue that the formulary changes were "public knowledge" (Def. Mem. at 23), but Defendants fail to identify what specific public reports may have contained information about Donnatal formulary changes. (See Def. Mem. at 23; Reply at 9.) Moreover, "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 127 (2d Cir. 2013). For purposes of this motion to dismiss, Plaintiffs have plausibly alleged that the formulary changes were not the

---

[3] Horizon Blue Cross/Blue Shield changed its formulary to exclude Donnatal "as of the second quarter of 2016." (Am. Compl. ¶ 48.) UnitedHealthcare did so on July 1, 2016, and Humana Group did so "[a]s of at latest November 2016." (Id. ¶¶ 45, 47.)

type of "information [that] one . . . reasonably should [have] be[en] aware of." See Alpha Capital

Anstalt v. New Generation Biofuels, Inc., 2014 WL 6466994, at *9 & nn.16-17 (S.D.N.Y. Nov.

18, 2014) ("[d]iscovery [was] necessary" to determine "how accessible" online reports were to

"a reasonable, or even a sophisticated, investor").

　　　Defendants seem to rely upon Kreppner's response on the May 13 Conference Call when

he was asked by analysts about "[a]ny changes on the reimbursement front." (Def. Mem. at 11.)

Keppner responded obliquely that "[t]here ha[ve] been changes over time on Donnatal[] due to

its regulatory status, but nothing other than that." (Id.) This statement was not "sufficiently

specific" to describe the formulary changes for Donnatal. See Initial Pub. Offering, 358 F. Supp.

2d at 211 (where company "[g]eneral[ly] disclos[ed] [the] amorphous risks" that it "could face a

loss of possible revenues from the non-renewal of advertising contracts" and could encounter

"the usual problems associated with any email system"). Defendants also point to Concordia's

SEC filings which mentioned "[f]ailure to be included in formularies." (Def. Mem. at 5-6.) But,

these filings failed to disclose that at least two of the country's largest health insurers—Aetna

and Horizon Blue Cross/Blue Shield—had terminated or decreased Donnatal's formulary

coverage. See Providence, 2013 WL 1197755, at *14 ("Warnings of specific risks do not shelter

defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude

of the risks described." (brackets and ellipsis omitted)); see also Hr'g Tr. at 28:12-14 ("[T]o

caution that something may go wrong is prudent. To say that it may happen when it's already

occurred is deceit. It's fraud.").

### August 3, 2016 Press Release

　　　The Court finds that the allegedly fraudulent statements in Concordia's August 3, 2016

press release—including the statements that the Company has "a strong free cash profile" and

"has no liquidity or debt issues" (Am. Compl. ¶ 85)—were "puffery" and are not actionable. See ECA, 553 F.3d at 206. They were "too general to cause a reasonable investor to rely upon them." See id. (citations omitted); SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp., 448 F. App'x 116, 117-18 (2d Cir. 2011) (where statements that company "developed a comprehensive [plan] to moderate liquidity risk," had "adequate liquidity," had "stabilized its liquidity," and had "strengthened its capital position" were puffery); Abuhamdan v. Blyth, Inc., 9 F. Supp. 3d 175, 190 (D. Conn. 2014) (where statement that "nothing in [company] fundamentals has changed" was puffery). In conjunction with this claim, Plaintiffs fail to identify "hard facts" requiring disclosure, such as an inability to service debt payments or to finance company operations, which would have been "critical to appreciating the magnitude of the risks described." Providence, 2013 WL 1197755, at *14 (quotations and citations omitted); see also Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 435 (S.D.N.Y. 2015) ("liquidity issue" was material where company "had defaulted on its obligation to meet [bank's] margin call and was not going to cover").

**(B) The Complaint Establishes a Strong Inference Of Scienter**

Defendants argue that the Amended Complaint fails to plead scienter because "the mere fact [that] a company is considering strategic alternatives [presumably arranging to sell the company to a private equity firm] or may be a possible acquisition target is insufficient to plead motive." (Def. Mem. at 16; Reply at 6-8.) And, "an executive's pledge of shares [in this case by Individual Defendant Thompson] as collateral for debt is not sufficient to show motive." (Def. Mem. at 15; Reply at 6-8.) Defendants assert that Plaintiffs fail to satisfy the "'correspondingly greater' burden to plead conscious fraud or recklessness" because "Plaintiffs have disclaimed any allegation that Concordia's sales projections are false" and "Concordia promptly revised its

outlook for Donnatal[] in its next quarterly financial release on August 12[, 2016]." (Def. Mem. at 17-25; Reply at 8-10.) Defendants also argue that any inference of scienter is not "compelling" due to a "non-fraudulent explanation for the downturn in Donnatal[] sales: the emergence of two new competitors." (Def. Mem. at 3, 13, 17; Reply at 5 n.5.)

Plaintiffs contend persuasively that the Amended Complaint adequately pleads scienter because alleging "a unique connection between the fraud and an acquisition," and a "pledge[] . . . [of] shares as collateral for personal loans," as occurred here, is "sufficient to establish motive." (Opp'n at 16-20.) Plaintiffs assert that the Amended Complaint also gives rise to a compelling inference of scienter through "conscious misbehavior" or recklessness because Defendants "knew facts or had access to information suggesting that their public statements were not accurate" and "Defendants' knowledge may be imputed under the core operations doctrine." (Id. at 20-23.)

**Motive and Opportunity**

Plaintiffs sufficiently allege motive and opportunity as to all Defendants premised upon the fact that in May 2016 (and earlier) the Company was seeking bids for a potential buyout. See Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000). "[I]t is counterintuitive that you would defraud investors about something that is going to come out anyway unless you have some acute, concrete, short-term motive." (H'rg Tr. at 22:19-22.) The "acute, concrete, short-term motive" here is reflected in Plaintiffs' claim that Concordia was endeavoring to sell itself and had set the deadline of May 31, 2016 for final buyout bids (Am. Compl. ¶ 107). See Rothman, 220 F.3d at 93 ("[T]he desire to consummate corporate transactions can[] . . . be a motive for securities fraud."). Defendants were allegedly concerned that news of "the firing of the [75-80] Donnatal-dedicated sales [representatives] on May 13, 2016[] would . . . scuttle any potential buyout."

(Opp'n at 17-18.) Plaintiffs' allegations of Defendants' motive are sufficient, e.g. that Defendants "were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible." See In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003); see also ECA, 553 F.3d at 201 ("[T]he artificial inflation of stock prices" can demonstrate scienter where plaintiffs "allege a unique connection between the fraud and the acquisition."); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) ("[T]he artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement.").

The Amended Complaint pleads motive and opportunity (as to both Concordia and Thompson) insofar as Thompson personally "pledged more than 2 million shares of Concordia common stock to secure personal loans" (id. ¶ 8). See Hall v. Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 416-17 (S.D.N.Y. 2003). As courts in this Circuit have recognized, where a corporate officer "pledg[es] shares of his common stock as collateral for . . . loans," "this pledge provide[s] [the officer] with a financial incentive to conceal . . . problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit." See Hall, 580 F. Supp. 2d at 223, 233; see also WorldCom, 294 F. Supp. 2d at 416-17. Such "allegations . . . are sufficient to create a strong inference that [the officer] acted with the requisite scienter." See id. Indeed, after the Company's stock price dropped 38% following the August 12 Conference Call, Concordia disclosed on August 22, 2016 that Thompson was "forced to sell . . . 505,000 of his [Concordia] shares as part of a margin call." (Am. Compl. ¶ 109.)

14

**Conscious Misbehavior or Recklessness**

The Amended Complaint also gives rise to an inference of scienter on the grounds of (Defendants') conscious misbehavior or recklessness. See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015). The Amended Complaint "plead[s] with specificity that the defendants had 'knowledge of facts or access to information contradicting their public statements,'" e.g. regarding the negative financial impact of the Donnatal salesforce terminations and formulary changes (exclusions) regarding Donnatal. Id. (quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)). For example, the Amended Complaint alleges that 75-80 salespersons were terminated "on the very same day" that Defendants "touted Concordia's 175-person Donnatal sales force." (Am. Compl. ¶ 9.) Plaintiffs further allege that Concordia executives were intimately involved in the hiring of the Donnatal salesforce and also "caused" the sales force terminations. (Id. ¶¶ 52-53, 56.)

With respect to the formularies, Plaintiffs have sufficiently alleged that Defendants knew or recklessly disregarded "nonpublic facts contradicting their public representations." See Pirnik v. Fiat Chrysler Automobiles, N.V., 2016 WL 5818590, at *7 (S.D.N.Y. 2016); see also S.E.C. v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998). Publicly, Defendants allegedly denied that there had been any "changes on the reimbursement front," i.e. formulary changes, and contended that "[i]t [wa]s business as usual." (Am. Compl. ¶¶ 77, 81.) But, Plaintiffs allege that "Defendants knew or were reckless in not knowing that many third-party payors [e.g. Aetna and Horizon Blue Cross/Blue Shield] had eliminated and were continuing to eliminate Donnatal from their formularies." (Id. ¶ 41.) The inconsistency between Defendants' public statements and their alleged knowledge or reckless disregard of nonpublic facts is sufficient to raise an inference of scienter. See Pirnik, 2016 WL 5818590, at *7 ("[I]t is enough at this stage for Plaintiffs to allege

that Defendants were aware of nonpublic facts contradicting their public representations."); see

also McNulty, 137 F.3d at 741 ("[T]he scienter needed for proof of a claim under § 10(b) or Rule

10b-5 may be established through a showing of reckless disregard for the truth . . . ." (citation

omitted)).

### (C) The Complaint Adequately Pleads Loss Causation

Defendants contend that Plaintiffs have failed to plead any facts showing that "[P]laintiffs

would have been spared all or an ascertainable portion of the loss absent the fraud." (Def. Mem.

at 25.) Defendants argue that Plaintiffs have not pled that the "August 12 stock price decline

resulted from the personnel or formulary issues or the other alleged misstatements." (Id.)

Plaintiffs counter that the Amended Complaint provides "a sufficiently direct link

between Defendants' alleged lies about the sales force and formulary issues and its revelation of

the Donnatal disaster." (Opp'n at 24.) Further, Plaintiffs argue that the Amended Complaint

satisfies the requirement that it "need only allege that the truth about the company's underlying

condition, when revealed, caused the economic loss." (Id. at 25 (brackets and internal quotation

marks omitted).)

The Court finds that Plaintiffs have met the "notice pleading standard" applicable to loss

causation. See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,

866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012) (quoting In re Bear Stearns Cos., Inc. Sec.,

Derivative, and ERISA Litig., 763 F.Supp.2d 423, 506–07 (S.D.N.Y. 2011)).  Plaintiffs have

sufficiently plead loss causation by "alleging the existence of cause-in-fact on the ground that the

market reacted negatively to a corrective disclosure of the fraud." In re Vale S.A. Sec. Litig.,

2017 WL 1102666, at *26 (S.D.N.Y. Mar. 23, 2017); see also Carpenters Pension Trust, 750

F.3d at 233 (plaintiff must allege "a disclosure of the fraud by which the available public

16

information regarding the company's financial condition was corrected, and that the market reacted negatively to the corrective disclosure" (brackets, citation, and internal quotation marks omitted)).

Plaintiffs persuasively argue that the Amended Complaint alleges a "corrective disclosure" theory of loss causation. See id. at 233-34. That is, Plaintiffs allege that Concordia's shares "plummet[ed] by 38%" immediately after the August 12 Conference Call, in which Defendants disclosed that the market for Donnatal was weaker than previously represented. (See Am. Compl. ¶¶ 89-91.) Borkowski stated on the August 12 Conference Call: "Donnatal is not being prescribed as frequently as we had anticipated, and we do not believe that, we will see the growth we expected from the additional sales efforts in the second-half of 2016. While our contract sales team has had success targeting traditional Donnatal prescribers, the sales team has had limited impact in growing the brand with doctors . . . ." (Id. ¶ 89.) Concordia also announced that Donnatal sales in the second quarter of 2016 were 31% less than sales in the second quarter of 2015, and almost 10% less than sales in the first quarter of 2016. (Id. ¶¶ 59-60, 96.) Plaintiffs allege that, "[o]n these disclosures, Concordia' stock price fell $6.33 per share, or 38%, to close at $10.03 per share on August 12, 2016." (Id. ¶ 94.) These allegations demonstrate that "the market reacted negatively to the . . . corrective disclosure," which is sufficient to allege loss causation. See Carpenters Pension Trust, 750 F.3d at 233-34 (where plaintiffs alleged that settlement agreements revealed misrepresentations about the company's financial condition, and that "the market reacted negatively to the . . . corrective disclosure by a significant (12%) decline in [defendant's] stock"); see also Vale, 2017 WL 1102666, at *26 (where "disclosure to the market . . . revealed new information directly contrary to Defendants' statements," and the disclosure was followed by a "decline in the price" of the company's securities).

Defendants have argued that Concordia's allegedly poor financial performance was caused by "significant changes on foreign exchange rates, primarily as a result of Brexit . . . and primarily due to increasing competitive pressures on key products in the U.S. business." (Am. Compl. ¶ 89.) But, "[w]hether a loss was 'caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" Bricklayers, 866 F. Supp. 2d at 245 (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003)).

### (D) The Amended Complaint Adequately States a Claim of Control Person Liability

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).[4] "[T]he control person provisions are broadly construed as they were meant to expand the scope of liability under the securities laws." In re Tronox, Inc. Sec. Litig., 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

Defendants claim Plaintiffs have failed to allege a primary violation or "'culpable participation' by any Defendant." (Def. Mem. at 25.) The Individual Defendants have not challenged their status as controlling persons within the Company.

Plaintiffs persuasively contend that they adequately plead a "primary violation of Section 10(b) and Rule 10b-5," in that that the Company "made untrue statements of material fact and/or

---

[4] In ATSI Communications, the court held that a plaintiff must "show" culpable participation, 493 F.3d at 108, but some courts in this District have held that "there is a difference . . . as to whether . . . allegations—as distinct from proof at trial—are required." In re Lehman Bros. Sec. & Erisa Litig., 799 F. Supp. 2d 258, 307 (S.D.N.Y. 2011). "[T]he question [of] whether a Section 20(a) complaint . . . must **allege** culpable participation[] . . . remains open in this Circuit." Id. (emphasis added).

omitted to state material facts necessary to make the statements not misleading [and] engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Concordia securities." (Am. Compl. ¶ 122.) As to culpable participation, Plaintiffs argue that the Amended Complaint "specifically alleges [D]efendants' knowledge of facts or access to information contradicting their public statements" (Opp'n at 20 (brackets omitted)), including that the Individual Defendants had "convened an emergency conference call and fired all 75-80 of [the] Donnatal salespeople" (see Am. Compl. ¶ 53; see also discussion supra at pp. 15-16).

### Primary Violation

For the reasons discussed supra pp. 7-18, Plaintiffs have sufficiently pled primary violations of Section 10(b) and Rule 10b-5 by a controlled person, i.e. the Company. See In re Inv. Tech. Grp., 2017 WL 1498055, at *20 (S.D.N.Y. Apr. 26, 2017).

### Culpable Participation

"[T]he question whether a Section 20(a) complaint, in order to state a legally sufficient claim for relief, must allege culpable participation [as opposed to proving at trial the culpable participation of defendants] . . . remains open in this Circuit." Lehman Bros., 799 F. Supp. 2d at 307. If Plaintiffs are not required to allege culpable participation, their claim of control person liability survives dismissal because they have alleged a primary violation (see supra pp. 7-18), and the Individual Defendants do not challenge their status as controlling persons. See ATSI Commc'ns, 493 F.3d at 108.

Assuming **arguendo** that culpable participation must be alleged in the Complaint (not simply proven at trial), the Court would likely find that Plaintiffs have satisfied this requirement. See In re Virtus Inv. Partners, Inc. Sec. Litig., 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016). That

is, the Amended Complaint alleges that the Individual Defendants each participated in the May
13 and August 12 Conference Calls in their capacities as senior representatives of the Company.
(Am. Compl. ¶¶ 55-57, 59.) During the Calls, the Individual Defendants did not mention the
firing of (43% of) the Donnatal salesforce which had occurred on the very same day as the May
13 Conference Call. (Id.) The Individual Defendants also never mentioned the exclusion of
Donnatal from Aetna's formularies on January 1, 2016, Horizon Blue Cross/Blue Shield's
formularies during the second quarter of 2016, and UnitedHealthcare's formularies on July 1,
2016. (Id. ¶¶ 44-48.) Tellingly, "each of the Individual Defendants is liable for the others'
statements [or omissions] made at conference calls in which they participated. A high-ranking
company official cannot sit quietly at a conference with analysts, knowing that another official is
making false statements and hope to escape liability for those statements. If nothing else, the
official is at fault for a material omission in failing to correct such statements in that context."
Freudenberg, 712 F. Supp. 2d at 195 (internal quotation marks omitted). Thus, each of the
Individual Defendants may fairly be said (at this motion-to-dismiss stage) to be a culpable
participant for failing to disclose the firing of 75-80 salespersons and the third-party formulary
changes. See id.

## IV.    Conclusion & Order

For the foregoing reasons, Defendants' motion to dismiss [#52] is granted in part and
denied in part.

A status/settlement conference with principals is hereby scheduled for September 13, 2017, at 9:00 a.m. in Courtroom 17B of the Daniel Patrick Moynihan Courthouse at 500 Pearl Street, New York, New York 10007.

Dated: New York, New York
      July 28, 2017

                                        *RMB*

                              **RICHARD M. BERMAN, U.S.D.J.**